Samuelson v. State.

## I. SAMUELSON *v.* STATE.

## (*Jackson.* April Term, 1906.)

1. **STATUTES.** Act prohibiting traffic in nontransferable signature passenger tickets, and requiring redemption of all unused tickets, is not unconstitutional as containing more than one subject.

A statute (Acts 1905, ch. 410) entitled "An act to prohibit traffic in nontransferable signature tickets issued by common carriers, and to require common carriers to redeem unused or partly used tickets, and to provide punishment for the violation of this act," and whose body prohibits the traffic in such nontransferable signature tickets, and requires common carriers to redeem, upon certain terms, all partly or wholly unused tickets sold by them, does not embrace more than one subject, nor does it, either in the title or body, embrace incongruous legislation, but it contains only one subject, with two branches naturally and intimately allied, and is not, therefore, violative of the constitutional provision that no bill shall become a law which embraces more than one subject, that subject to be expressed in the title. (*Post, pp.* 475-483.)

Act cited and construed: 1905, ch. 410.

Constitution cited and construed: Art. 2, sec. 17.

Cases cited and approved: Cannon v. Mathes, 8 Heis., 405; Luehrman v. Taxing District, 2 Lea, 426; Morrell v. Fickle, 3 Lea, 79; Frazier v. Railroad, 88 Tenn., 138; Ex parte Griffin, 88 Tenn., 550; Manufacturing Co. v. Falls, 90 Tenn., 469; State v. Yardley, 95 Tenn., 554; Ryan v. Terminal Co., 102 Tenn., 111.

Cases cited and distinguished: State v. McCann, 4 Lea, 1; Murphy v. State, 9 Lea, 373; Ragio v. State, 86 Tenn., 272; Bank v. Devine, 97 Tenn., 603; Saunders v. Savage, 108 Tenn., 340; State v. Hayes, 116 Tenn., 40.

Samuelson v. State.

2. SAME. Same. Act prohibiting traffic in nontransferable signature passenger tickets and making such traffic a misdemeanor is not unconstitutional as a delegation of legislative authority to the common carrier.

A statute (Acts 1905, ch. 410) prohibiting traffic in nontransferable signature tickets issued and sold below the standard schedule rate by common carriers, and making such traffic a misdemeanor, is not unconstitutional as a delegation to the common carrier of legislative authority to create a penal offense or not by the issuance or nonissuance or nontransferable signature tickets to the original purchaser below the standard schedule rate. (*Post, pp.* 475-477, 484-488.)

Acts cited and construed: 1905, ch. 410.

Constitution referred to: Art. 2, sec. 3.

Cases cited and approved: Debardelaben v. State, 99 Tenn., 649; Railroad v. Clinton Co., 1 Ohio St., 88; Locke's Appeal, 72 Pa., 491; State v. Thompson, 160 Mo., 333; State v. Barringer, 110 N. C., 525; Commonwealth v. Abrahams, 156 Mass., 57; Commonwealth v. Davis, 140 Mass., 485; In re Nightingale, 11 Pick. (Mass.), 168; Commissioners v. Covey, 74 Md., 262; In re Flaherty, 105 Cal., 558.

Cases cited and disapproved: Jannin v. State, 42 Tex. Crim. Rep., 631; Allardt v. People, 197 Ill., 501.

3. SAME. Same. Same. Act prohibiting traffic in nontransferable signature passenger tickets is proper legislation under police powers.

A statute (Acts 1905, ch. 410) prohibiting traffic in nontransferable signature passenger tickets issued and sold below the standard schedule rate by common carriers is legislation in the proper exercise of the police powers by the State to prevent fraud and the corruption of public morals. (*Post, pp.* 475-477, 488-490.)

Acts cited and construed: 1905, ch. 410.

Cases cited and approved: Note by Mr. Freeman to Jannin v. State, 42 Tex. Crim. Rep., 631, 96 Am. St. Rep., 821, 51 S. W., 1126, 62 S. W., 419; Burdick v. People, 149 Ill., 600; Fry v. State, 63 Ind., 552; State v. Corbett, 57 Minn., 345; State v. Bernhein,

Samuelson v. State.

19 Mont., 512; Commonwealth v. Wilson, 14 Phila. (Pa.), 384; Commonwealth v. Keary, 198 Pa., 500; Ex parte Tuttle, 91 Cal., 589.

**4. SAME.** Same. Same. Same. Such statute is not unconstitutional as class legislation.

Such statute is not unconstitutional as class legislation suspending a general law for the benefit of particular individuals, namely, common carriers of passengers, because it is in the proper exercise of the police powers. (*Post, pp.* 475-477, 488-490.)

Acts cited and construed: 1905, ch. 410.

Constitution cited and construed: Art. 11, sec. 8.

Cases cited and approved: See citations under headnote 3.

**5. SAME.** Same. Same. Same. Same. Such statute is not unconstitutional as deprivation of property without due process of law.

A statute (Acts 1905, ch. 410) prohibiting traffic in nontransferable signature passenger tickets issued and sold below the standard schedule rate by common carriers, and requiring the redemption of all partly or wholly unused tickets, is not unconstitutional as depriving the original purchaser of a property right without due process of law, because such a passenger ticket is a mere token of the purchaser's right to be transported according to its terms, and is not property, nor is it to be treated as property in its general sense. (*Post, pp.* 475-477, 490, 491.)

Acts cited and construed: 1905, ch. 410.

Constitution referred to: Art. 1, sec. 8.

Cases cited and approved: O'Rourke's Case, 103 Tenn., 124; Ex parte Lorenzen, 128 Cal., 431; dissenting opinion in Tyroler's Case, 157 N. Y., 116; and citations under headnote 3.

**6. SALE.** Act prohibiting traffic in nontransferable signature passenger tickets is not invalid in its application to interstate passenger travel.

A statute (Acts 1905, ch. 410) prohibiting traffic in nontransferable signature passenger tickets issued and sold below the

Samuelson v. State.

standard schedule rate by common carriers, in its application to such tickets issued and sold for passage from Tennessee into another State, is not invalid as an unwarranted interference with interstate commerce or interstate passenger travel. (*Post, pp.* 475-477, 491, 492.)

Acts cited and construed: 1905, ch. 410.

Constitution of the United States referred to: Art. 1, secs. 8 (3), 9, and 10.

Cases cited and approved: Fry v. State, 63 Ind., 552; State v. Corbett, 57 Minn., 345.

**7. SAME.** **Indeterminate statutes will not be enforced, when.**
When a statute is so indeterminate as to leave juries with their varying opinions to settle the standard, the statute will not be enforced. (*Post, pp.* 492, 493.)

Cases cited and approved: Railroad v. Commonwealth (Ky. Sup. Ct., April, 1896), 35 S. W. 129; Cook v. State (Ind. App., Feb., 1901), 59 N. E., 489; Matthews v. Murphy (Ky.), 63 S. W., 785, 54 L. R. A., 415; Ex parte McNulty, 77 Cal., 164; Ex parte Jackson, 45 Ark., 158.

**8. SAME.** **Same. Statute not defining "standard schedule rates," but enacted with reference to such rates established under existing laws is not invalid for vagueness, when.**
A statute (Acts 1905, ch. 410) prohibiting traffic in nontransferable signature passenger tickets issued and sold "below the standard schedule rate" is not invalid for vagueness, uncertainty, and indeterminateness in failing to define the "standard schedule rate," because the enactment is made, as to interstate commerce travel, with reference to the standard schedule rates established under the sixth section of the interstate commerce act of congress, and as to interstate railroad travel, with reference to the "standard schedule rates" established under our Acts, 1897, ch. 10, sec. 22. (*Post, pp.* 475-477, 492-495.)

Acts cited and construed: 1897, ch. 10, sec. 22; 1905, ch. 410.

Samuelson v. State.

9. **SAME.** Act prohibiting traffic in nontransferable signature
   passenger tickets by all except the agents of the common
   carriers issuing same, who sell and redeem same only, is
   not objectionable, when.

A statute (Acts 1905, ch. 410), making it unlawful for any person,
other than the authorized agent of the common carrier issuing
the same, to sell or otherwise deal in nontransferable signature
passenger tickets issued and sold below the standard schedule
rate, is not objectionable as prohibiting the business of dealing
in such tickets by all persons except such agents, and as permit-
ting such agents to deal in such tickets because the extent of
the traffic in such tickets by such agents is confined to the sell-
ing of such tickets to the original purchasers and the repurchas-
ing thereof by redemption for the common carriers.  (*Post, pp.*
475-477, 495-499.)

Acts cited and construed:  1905, ch. 410.

10. **SAME.** Grammatical construction usually adopted, but will
    be disregarded, when.

In the construction of statutes, the grammatical sense of the
words used is generally to be adopted, but if there is any ambig-
uity, or if there is room for more than one interpretation, the
rules of grammar will be disregarded where a too strict adher-
ence to them would raise a repugnance or absurdity, or would
defeat the purpose of the statute.  (*Post, pp.* 496-498.)

Cases cited and approved:  Manufacturing Co. v. Falls, 90 Tenn.,
469; State, ex rel., v. Brewing Co., 104 Tenn., 715; Garby v. Har-
ris, 7 Exch., 591; Met. Bo. Wks. v. Steed, L. R., 82, B. Div., 445;
George v. B. of E., 33 Ga., 344; State v. Heman, 70 Mo., 441;
Railroad v. Herrick, 13 Bush. (Ky.), 122; Rutherford v. Green, 2
Wheat., 196; Babcock v. Goodrich, 47 Cal., 488.

---

FROM SHELBY.

---

Appeal from the Criminal Court of Shelby County.—
JOHN T. MOSS, Judge.

LEHMAN, GATES & LEHMAN and MORITZ ROSENTHAL, for Samuelson..

ATTORNEY-GENERAL CATES, CHARLES N. BURCH, A. W. BIGGS, F. T. EDMONDSON, and M. R. PATTERSON, for State.

MR. CHIEF JUSTICE BEARD delivered the opinion of the Court.

The plaintiff in error was convicted in the criminal court of Shelby county, of a violation of chapter 410, p. 873, of the Session Acts of 1905.    It is agreed that the facts proven brought the offense charged within the provisions of the act, and the only question made on the record is as to its constitutionality.    It is in these words:

"CHAPTER 410.    SENATE BILL No. 492.

"An act to prohibit traffic in nontransferable signature tickets issued by common carriers, and to require common carriers to redeem unused or partly used tickets, and to provide punishment for the volation of this act.

"Section 1.    Be it enacted by the general assembly of the State of Tennessee, that it shall be unlawful for any person, other than the authorized agent of the common carrier issuing the same, to sell, or otherwise deal in or offer to sell, any railroad, railway, steamship, or steamboat passenger ticket which shows that it was issued and sold below the standard schedule rate under con-

tract with the original purchaser entered upon such ticket and signed by the orignal purchaser, to the effect that such ticket is nontransferable and void in the hands of any person other than the original purchaser thereof: Provided, however, that nothing in this act shall be construed as depriving the original purchaser of a transferable ticket of a right to sell same to a person who will in good faith personally use it in the prosecution of a journey.

"Sec. 2. Be it further enacted, that it shall be the duty of every common carrier that shall have sold any ticket or other evidence of the purchaser's right to travel on its line (or any line of which it forms a part), to, if the whole of such ticket be unused, redeem the same, paying the original purchaser thereof the actual amount for which said ticket was sold; or, if any part of such ticket be unused, to redeem such unused part, paying the original purchaser thereof at a rate which shall be equal to the difference between the price paid for the whole ticket and the price of a ticket between the points for which said ticket was actually used; provided, such purchaser shall present such unused or partly used ticket for redemption within six (6) months after the date of its issuance, to the officer or agent who shall be authorized or designated by such common carrier to redeem unused or partly used tickets, and the said officer shall, within fifteen (15) days after the receipt of said ticket, redeem the same as hereinbefore provided for. Such redemp-

tion shall be made without cost of exchange or other expense to the purchaser of the ticket.

"Sec. 3.  Be it further enacted, that any person or corporation violating any of the provisions of this act shall be guilty of a misdemeanor, and shall, upon conviction thereof, be punished by fine in the sum of not less than fifty ($50) dollars, nor more than one hundred ($100) dollars.

"Sec.    4.   Be it further enacted, that this act take effect from and after its passage, the public welfare requiring it.

"Passed April 13, 1905.

                    "E. RICE,

                          "Speaker of the Senate.

          "W. K. ABERNATHY,

"Speaker of the House of Representatives.

"Approved April 14, 1905:

                    "JOHN I. COX, Governor."

The first objection made by the plaintiff in error is that this statute violates so much of section 17 of article 2 of our State constitution as provides: "No bill shall become a law which embraces more than one subject, that subject to be expressed in the title."

The purpose of this provision is well understood by the profession.  Log rolling among legislators, followed often by incongruous statutes, grew to be a flagrant evil. Under that system it was altogether possible, by adroit management, for a vicious section to be concealed in a multitude of sound provisions, under an innocent, mean-

ingless caption, and thus become enacted into law without attracting the attention of a large part of the members of the legislature, or of the public. It was to root out this evil practice, through which such baneful results might be accomplished, that this constitutional provision was adopted.

The leading case in this State, and the one in which the clause was examined and proper limitations imposed upon it, is that of *Cannon* v. *Mathes,* 8 Heisk., 504. Later cases have been but an application of the principle therein announced. The statute in question in that case was entitled "An act to fix the State tax on property," and it contained a section providing for a tax on "privileges." The insistence was that, inasmuch as "privileges" were not "property," there was such incongruity in the act as made it obnoxious to this constitutional requirement.

In meeting the argument on which this insistence rested, after quoting with approval from the text of Judge Cooley, in his work on Constitutional Limitations, that "the generality of a title is no objection to it so long as it is not made a cover to legislation incongruous in itself, and which by no fair intendment can be considered as having a necessary or proper connection," the opinion proceeded to make clear that the act embraced but one subject, that of the raising of State revenue by taxation on property and privileges, and this subject was expressed in the title. In concluding, the court, rejecting the narrowness of interpretation, which would

seriously hamper legislation, deduced from the authorities this general rule: "Any provision of the act directly or indirectly relating to the subject expressed in the title, and having a natural connection therewith and not foreign thereto, should be held embraced in it."

The rule announced by Chief Justice Nicholson in that case has been later applied by this court on many occasions. In *Frazier* v. *Railway Company*, 88 Tenn., 138, 12 S. W., 537, it was held that the title, "An act to amend the law in relation to the consolidation of railways," naturally embraced a provision that "no railroad company shall have power under this act or any of the laws of this State to give or create any mortgage . . . which shall be valid and binding against judgments and decrees and executions therefrom, for timbers furnished and work and labor done on, or for damages done to persons and property in the operation of its railroad in this State."

In *Ryan* v. *Terminal Company*, 102 Tenn., 111, 50 S. W., 744, 45 L. R. A., 303, a statute which, under the title of "An act to amend an act entitled 'An act to provide for an organization of railroad terminal corporations, and to define the powers, duties and liabilities thereof,'" enacted, *inter alia*, that a railroad company contracting for use of the facilities of a terminal company shall have power to own stock and bonds of such terminal company and to guarantee its bonds and other contracts, was held not to be violative of the constitution as grouping foreign or incongruous matter under the title.

Among the many cases which have recognized the essential wisdom of the liberal rule of construction, as announced in *Cannon* v. *Mathes,* supra, and have applied it to the saving of different statutes, attacked on like ground with the present, are *Luehrman* v. *Taxing District,* 2 Lea, 426; *Morrell* v. *Fickle,* 3 Lea, 79; *Ex parte Griffin,* 88 Tenn., 550, 13 S. W., 75; *Cole Mfg. Co.* v. *Falls,* 90 Tenn., 469, 16 S. W., 1045; *State* v. *Yardley,* 95 Tenn., 554, 32 S. W., 481, 34 L. R. A., 656.

Coming now, in the light of these cases, to the act in question, does it, either in title or body, cover incongruous legislation? Its evident purpose is to regulate the issuance, sale, and redemption of tickets sold by common carriers as evidences of the rights of purchasers to pass over the routes of travel covered by the tickets. For reasons satisfactory to itself, the legislature, in the matter of regulation, saw proper to prohibit the dealing in nontransferable signature tickets, issued and sold by the common carrier to original purchasers below the standard schedule rate, by any other person than the authorized agent of the carrier. Assuming for the moment, that this legislation is within the police power of the State, then it seems to us there is no necessary incongruity between it and a provision requiring the carrier to deem all tickets sold by him where they have been wholly or in part unused. To the contrary, we think there is a natural connection between the two. In the statute, the legislature in effect says to the common carrier: We concede that it is a wise and proper thing to

Samuelson v. State.

protect you, and indirectly the public by absolutely breaking up this system of general or indiscriminate dealing in tickets which have been sold to original purchasers at reduced rates, and upon signed agreements that they were not transferable; but this relief is given upon the condition that you promptly redeem all tickets sold by you which are unused in whole or in part. We see no reason why such legislation should he held void, when the statute in question in the *Frazier Case,* in the *Ryan Case,* and other cases referred to, have been maintained as a constitutional exercise of legislative power.

If the caption had been "An act to regulate the sale and redemption of tickets by common carriers," we think it would hardly be insisted that the redemption of tickets was so foreign to their sale that both could not be embraced in the same act. Or, if the act had been entitled "An act to prohibit all traffic in tickets issued by common carriers, save through their authorized agents, and to require common carriers to redeem all tickets issued by them, when wholly or in part unused," could it be maintained that an act framed in accordance with this caption was violative of the clause of the constitution we are now considering? We think not. If not, it is because neither caption nor body of the act would embrace two subjects, but rather two branches, naturally and intimately allied, of the same subject.

Neither is this contention of the plaintiff in error strengthened, nor the argument contra weakened, by the

116 Tenn.—31

coupling with the word "ticket" of the phrase "or other evidence of the purchaser's right to travel on its line" in the second section of the act. Even without the aid of the rule of *ejusdem generis* it is clear the phrase, while ampler, is used simply as the equivalent of "ticket"—of something purchased which gives the holder the right of travel, and is therefore within the authority of *Cannon* v. *Mathes,* supra. In addition, a reading of section 2 discloses that, notwithstanding the use of this phrase and its association, yet, when redemption is provided for, it is only the "ticket" which is included. In either view we are satisfied the provision for redemption is within the title of the act.

This being entirely clear to us, we are unable to see why the present act is not constitutional, so far as this objection is concerned. It is true that the inhibition extends only to nontransferable signature tickets, while the duty of redemption is laid on the carrier as to all tickets which are wholly or in part unused; but we cannot see how the narrowness of the inhibitory clause will make two subjects alien to one another of that which would be otherwise germane and entirely congruous; nor de we believe so anomalous a result follows:

Many cases which, it is assumed, present a different view of this constitutional clause, have been pressed upon us in the very learned briefs of the several counsel of the plaintiff in error. Among those are *Murphy* v. *State,* 9 Lea, 373; *State* v. *McCann,* 4 Lea, 1; *Bank* v. *Devine,* 97 Tenn., 603, 37 S. W., 390; *Saunders* v. *Sav-*

*age,* 108 Tenn., 340, 67 S. W., 471; *Ragio* v. *State,* 86 Tenn., 272, 6 S. W., 401; and *State* v. *Hayes,* 116 Tenn., 40, 93 S. W., 98.

No question is made, nor is any doubt entertained by us, of the soundness of the conclusions reached by the court in the several cases. All of these, however, we think, are clearly to be distinguished from those upon the authority of which we place our holding in the present case. *State* v. *Gerst,* supra, involved a statute with the most restricted caption, embracing, however, provisions extending far beyond the limits of the caption, and having no natural connection with it. So it was in the other cases referred to by plaintiff in error; each was decided upon the distinctive features of the act there in question. After all it is to be remembered, as was said in *Frazier* v. *Railway Company,* supra: "The subjects of legislation are infinite. The determination as to whether the several provisions of an act are congruous and germane becomes largely a question of fact. Particular decisions cannot often be controlling in determination of subsequent cases arising out of this constitutional provision." We repeat here the language used in *Ryan* v. *Terminal Co.,* supra: "As each case is presented, the courts are bound to examine the act in question as a whole, and applying to it the sound rule of construction announced in *Cannon* v. *Mathes,* supra, and their 'own knowledge of affairs' (*Frazier* v. *Railway Co.,* supra), determine whether its provisions are congruous or not."

Again, it is contended that the act is unconstitutional because it is assumed it delegates to the common carrier the power to suspend or put in force its provisions at pleasure. We take it that this contention involves the idea that the statute in effect delegates to the common carrier legislative authority to create, or not, a penal offense by the issuance or nonissuance of nontransferable tickets to the original purchaser below the standard rate schedule. This objection is necessarily addressed to that part of our constitution which vests the legislative power of the State in the general assembly.

Is this contention sound? Does the statute delegate the power to the common carrier, at his pleasure, to create a penal offense? Upon its face, and as it came from the hands of the legislature, it seems to be complete legislation. It defines the offense and fixes the penalty. It is true it is not self-executing, nor does it come into active operation until the condition arises contemplated by its terms. The common carrier is not bound to issue a nontransferable signature ticket, nor is any person obligated to purchase such ticket. But when the carrier does issue this ticket, and a signature purchaser is found for it, then a contract relation has been created, out of the violation of which an offense against the statute results. It is to be observed, however, that it is neither in the issuance nor original purchase that the penalty is incurred. Both these are innocent acts. It is only after these things have been done, after the control of the com-

Samuelson v. State.

mon carrier over the ticket has temporarily ended, that the penalty is incurred, if incurred at all.

This is by no means the only law on our books which, seemingly perfect when passed, becomes effectual to punish, when through agencies not in existence at its passage and altogether voluntary in their subsequent actions is aroused to activity. Take the case of the four-mile law, which makes it unlawful to sell liquor within four miles of a schoolhouse, public or private, whether school be in session or not. This legislation was directed, not only to conditions then in existence, but to similar conditions which might arise thereafter. So it was possible for a person to make unlawful the sale of liquor by establishing a school within four miles of a place where one was then and had been before engaged in its lawful sale. Yet we have not heard it insisted that this option to make unlawful what was before lawful invalidated this wise and wholesome statute, in that it was a delegation of legislative authority to the one exercising this option.

As another illustration of the same species of legislation, we have the statute regulating conditional sales of personal property (chapters 12, 15, pp. 19, 24, Acts 1899), by which it is made a misdemeanor for a purchaser to dispose of the property bought by him until it is paid for, provided the seller has retained the title in a written or printed contract of sale, but it is not misdemeanor if the title has been retained in parol. If the argument of the counsel for plaintiff in error is correct,

then it would be impossible to sustain this act, yet we have not known of its constitutionality being called in question.

We think the argument on which this contention rests unsound. The carrier, by the terms of the statute, is neither delegated the power to make the law, nor the offense. The law was made, and the offense was defined, by the legislature. The mere fact that it is within the power of parties of their own volition to create a condition from which a penalty might arise or be incurred did not affect the statute. The true distinction, said the supreme court of Ohio, in *Cincinnati, W. & Z. R. Co.* v. *Clinton Co.,* 1 Ohio St., 88, "is between the delegation of power to make a law, which necessarily involves a discretion as to what it shall be, and conferring authority or discretion as to its execution to be exercised under and in pursuance of the law. The first cannot be done; to the latter no valid objection can be made." So, in *Locke's Appeal,* 72 Pa., 491, 13 Am. Rep., 716, it is said: "The legislature cannot delegate its power to make a law, but it can make a law to delegate a power to determine some fact, or state of things, upon which the law makes, or intends to make, its own action depend. To deny this would be to stop the wheels of government."

This phase of the question underwent examination and the conclusion of the court with regard to it was supported by a full citation of authorities in *State* v. *Thompson,* 160 Mo., 333, 60 S. W., 1077, 54 L. R. A., 950,

83 Am. St. Rep., 468. The statute in question was one regulating book making and pool selling in the State of Missouri, and it forbade the doing of either of these things without license, but provided that any one of good character might apply to the State auditor for a license to sell pools, make books, etc., who, after being satisfied of the good character of the applicant and good repute of the racecourse, etc., upon which the applicant desired to do business, might issue a license authorizing to do these things. The insistence there was that this statute was unconstitutional, in that it delegated legislative power to a State officer. This view, however, was rejected by the court, which held that it was rather a delegation of determining power, and as such within the competency of the legislature. In support of its conclusion, many cases were referred to, among these being *State* v. *Barringer,* 110 N. C., 525, 14 S. E., 781; *Commonwealth* v. *Abrahams,* 156 Mass., 57, 30 N. E., 79; *Commonwealth* v. *Davis,* 140 Mass., 485, 4 N. E. 577; *In re Nightingale,* 11 Pick. (Mass.), 168; *Com'rs* v. *Covey,* 74 Md., 262, 22 Atl., 266; *In re Flaherty,* 105 Cal., 558, 38 Pac., 981, 27 L. R. A., 529. To these may be added the case of *Debardelaben* v. *State,* 99 Tenn., 649, 42 S. W., 684.

To sustain his contention the plaintiff in error, through counsel, refers to *Jannin* v. *State,* 42 Tex. Cr. R., 631, 51 S. W., 1126, 62 S. W., 419, 96 Am. St. Rep., 821, and *Allardt* v. *People,* 197 Ill., 501, 64 N. E., 533. We have examined these cases, and, while they give

strong support to this contention, we are not satisfied
to follow them, believing that the weight of authority
and—with great respect for the learned courts deciding
them—of correct reasoning is against them.

It is further said that the statute is vicious class legis-
lation in violation of section 8, art. 11, of the State con-
stitution, in that it suspends a general law for the bene-
fit of the common carrier. This objection may be con-
sidered in connection with the question whether the
legislation is a proper exercise of police power by the
State. In a very extensive and valuable note by Mr.
Freeman to the case of *Jannin* v. *State,* 42 Tex. Cr. R.,
631, 51 S. W., 1126, 62 S. W., 419, 96 Am. St. Rep., 821,
there will be found a discussion of these questions and a
full citation of the cases. With regard to this last ques-
tion Mr. Freeman says that, whenever it has "been pre-
sented to the courts for decision, it has been almost uni-
formly decided that it is a reasonable and proper exer-
cise of the State police power by the legislature when
seeking to put an end to frauds in the sale of passage
tickets to require carriers, who are usually created by
legislation, to sell their own tickets, either directly or
through duly authorized agents. . . . The courts
generally hold that the legislature, in the constitutional
exercise of police power, has a right to say to the com-
mon carrier, so as to bind him: 'You must select and
duly commission the agents who are to sell your pas-
sage tickets, and no one else shall engage in that busi-
ness.' And it has a right to say to all other persons:

'You shall not, without incurring a penalty, engage in buying and selling passage tickets unless authorized so to do.' This is the effect of the decisions in the following cases: *Burdick* v. *People*, 149 Ill., 600, 36 N. E., 948, 124 L. R. A., 152, 41 Am. St. Rep., 329; *Fry* v. *State*, 63 Ind., 552, 30 Am. Rep., 238; *State* v. *Corbett*, 57 Minn., 345, 59 N. W., 317, 24 L. R. A., 498; *State* v. *Bernheim*, 19 Mont., 512, 49 Pac., 441; *Commonwealth* v. *Wilson*, 14 Phila. (Pa.), 384; *Commonwealth* v. *Keary*, 198 Pa., 500, 48 Atl., 472." In *State* v. *Corbett*, supra, the court said: That "the transportation of passengers is a proper subject for police regulation by the State is unquestioned, and, if a business itself is a subject of police regulation, then so are its incidents and accessories. That the matter of the issue and transfer of tickets as evidence of the contracts of carriers is an incident and accessory of the business needs no argument. And where a business is a proper subject of a police power, the legislature may in the exercise of that power adopt any measures not in conflict with the provision of the constitution that he sees fit, provided only they are such as have some relation to and some tendency to accomplish the desired end." And why is not such regulation properly exercised under the police power? In the case of *Ex parte Tuttle*, 91 Cal., 589, 27 Pac., 933, it is said: "Any practice or business, the tendency of which, as shown by experience, is to weaken or corrupt the morals of those who follow it, . . . is a legitimate subject for regulation or prohibition by the

State." That the sale as well as the purchase of non-transferable passage tickets is a fraud upon the carrier and the public, the tendency of which is the demoralization of rates, has been settled by the general consensus of opinion among the courts. This being so, an answer is furnished to the other branch of the contention, to wit, that the act is unconstitutional, because class legislation. For, if repressing the traffic is a proper exercise of police power, then the objection does not lie that it is arbitrary or class legislation. And such is the view of all the courts, save those of New York, and, as we understand, the judgments of those courts are rested upon statutes which, as construed by them, distinguish them from our act of 1905, and similar acts construed by the various courts to whose opinions we have referred.

Again, it is contended that the effect of this statute is to deprive a party of a property right without due process of law. The courts generally, if not entirely, agree in holding, as to the character of a passage ticket, with the dissenting judges, Bartlett and Martin, in *Tyroler's Case,* 157 N. Y., 116, 51 N. E., 1006, 68 Am. St. Rep., 763, that it is not property, nor is it to be treated as property in its general sense, but as a simple token of the purchaser's right to be transported on the railroad between the points named on the ticket, and when it has served its purpose to be delivered to the carrier issuing it. This was the view taken in *O'Rourke's Case,* 103 Tenn., 124, 52 S. W., 872, 46 L. R. A., 614, 76 Am. St. Rep., 639. So it is the courts have held that the sale of

such tickets by persons other than the carrier or his agents, as a business, is not an employment in which they have an unqualified right to engage. If it be true that the ticket is a mere incident to the business of the carrier in transporting his passengers, possessing none of the ordinary elements of property, then it follows that without the consent of the carrier, dealing in these tickets cannot form the basis of a legitimate independent business. As is said by Mr. Freeman in the note referred to: "Third persons have no constitutional right to interfere with the relations between the carrier and the passenger by the purchase and sale, without its consent, of tickets issued by the former. Hence statutes which confine the purchase or sale of such tickets to the carrier, or his authorized agent, can in no way deprive a third person of his property without due process of law, nor deny to him the equal protection of the law.' The same authorities which are cited by Mr. Freeman in his discussion of the question of the exercise of police power and class legislation involved in such acts are cited by him to the proposition above, with the addition of *Ex parte Lorenzen,* 128 Cal., 431, 61 Pac., 68, 50 L. R. A., 55, 79 Am. St. Rep., 47. The State of New York stands alone in maintaining a contrary rule.

It is also insisted that, inasmuch as the ticket, for dealing in which the indictment in this case was found, was one issued for passage from Tennessee into another State, the effect of the application of the statute to this case was an unwarranted interference with interstate

commerce. In *State* v. *Corbett,* supra, this objection is answered in this wise: "The law is not a revenue law, and is not designed to and does not regulate interstate commerce at all. It is a mere police regulation of the sale and transfer of tickets, designed to protect the public from frauds, and its interference, if any, with interstate commerce, is purely incidental and accidental." Again, in *Fry* v. *State,* supra,the court said: "It cannot be said, we think, that the statute of this State, above quoted, in any manner impedes, obstructs, or casts any burden upon the free course of commerce, is so far as interstate passenger travel is concerned. The statute imposes certain prescribed duties upon common carriers of passengers and their agents; but the discharge of these duties does not and cannot, as it seems to us, obstruct, or change, or cast any burden upon the commerce of the country or interstate passenger travel."

We think this view is eminently sound, and certainly it is abundantly supported by authority.

Again, it is contended the statute must fall because of vagueness, and therein is a fatal omission in fixing a "standard schedule rate" in reference to which nontransferable signature tickets are sold. The argument is that one jury might find one rate to be the standard schedule rate, while another might find another rate. If this be true, then the statute must fall, for the authorities all seem to hold that, where the statute in question is so indeterminate as to leave juries with their varying opinions to settle the standard, the statute will

Samuelson v. State.

not be enforced. In *L. & N. R. R. Co.* v. *Commonwealth* (Ky. Sup. Ct.; April, 1896), 35 S. W., 129, a statute providing that, if any railroad corporation shall charge or collect more than a just and reasonable rate of toll for the transportation of passengers or freight, it shall be guilty of extortion, and fixing a penalty therefor, was held void for uncertainty, in that it failed to prescribe a standard as to what is just and reasonable by which the carrier could regulate its conduct. In *Cook* v. *State* (Ind. App.; Feb., 1901), 59 N. E., 489, it was held that a statute which made it an offense to haul over turnpikes and gravel roads, in specified weather, loads of more than 2,000 pounds in narrow-tired wagons, or of more than 2,500 pounds in broad-tired wagons, was void for uncertainty, because it failed to provide a standard by which board or narrow tires might be determined. In line with these cases are *Matthews* v. *Murphy* (Ky.), 63 S. W., 785, 54 L. R. A., 415; *Ex parte McNulty,* 77 Cal., 164, 19 Pac., 237, 11 Am. St. Rep., 257; *Ex parte Jackson,* 45 Ark., 158, and other cases relied on by plaintiff in error.

But is the expression "standard schedule rate" vague and uncertain, so as to fall under the condemnation of these cases? We think not. So far as interstate commerce travel is concerned, section 6 of the interstate commerce act provides for it by requiring every common carrier, subject to the provisions of the act, to print and keep open to public inspection schedules showing the rates, fares, and charges for the transportation of pas-

sengers and property which any such common carrier has established, and which are in force at the time on its route. This section also provides that these printed schedules shall plainly state the places upon its railroad between which property and passengers will be carried, and these schedules are to be plainly printed in large type copies for the use of the public, and shall be posted in two conspicuous places in every depot, station, or office of the common carrier where passengers or freight are received for transportation. There is a similar provision as to joint rates over one or more connecting roads. In addition, the act provides that "every common carrier subject to the provisions of this act, shall file with the commission . . . copies of its schedule of rates, fares, and charges which have been established and published in compliance with the requirements" of the act, and shall notify the commission of all changes made in the same. When these rates, fares, and charges have been established by the common carrier, the act provides: "It shall be unlawful for such carrier to charge, demand, collect, or receive from any person or persons a greater or less compensation for the transportation of passengers or property . . . than is specified in such published schedules of rates, fares, and charges as may at the time be in force."

After thus providing for the establishing and publication of rates, etc., and against all manner of discrimination in reference thereto, the last section of the act is as follows: ". . . Nothing in this act shall prevent

. . . . the issuance of mileage, excursion, or commutation passenger tickets."

So we think there is no uncertainty in fact in the matter of interstate travel as to what is, at any particular time, the standard schedule rate for the sale of passenger tickets, and when chapter 410 speaks of tickets being sold below that rate it refers to the standard established and made public under this act of congress.

Nor is there any more uncertainty as to intrapassenger rates. So far as railroads are concerned, these are provided for in chapter 10, p. 121, of our Session Acts of 1897. By section 22 of that act it is made the duty of all persons or corporations who shall own or operate a railroad in this State, within thirty days after the passage of the act, to furnish to the railroad commission created by the act its tariff of charges of every kind for examination and correction, and when corrected the commission was required to append a certificate of approval to this tariff of charges, and it was then made the duty of the railroad company, or its operators, to post at each of its depots in conspicuous places the rates, schedules, and tariffs for transportation of passengers and of freight.

But it is earnestly argued, though not made the subject of an assignment of error, that, whatever may have been the purpose of the draftsman of this act, yet its effect is to make it unlawful in every one, save the authorized agents of common carriers, to be engaged as ticket brokers, and possible to continue the ticket brok-

Samuelson v. State.

er's business as a lawful avocation when carried on by these agents. To put the objection, which it is assumed to be fatal to the act, in the words of counsel: "It makes it unlawful for any person, including the original purchaser, to sell, etc., tickets of a certain character, and punishes a violation of the act by a heavy fine, while it permits the authorized agent of the common carrier issuing the tickets to violate the act at will. . . ." It is very clear from the language used that the sale of or dealing in railway and other tickets by the authorized agent of the common carrier, issuing the same, which is made innocent by the act, though punishable when done by any other person, is not the original sale, but is a re-sale of the ticket after it has left the hands of the railway company and has passed into the hands of the original purchaser for a subsequent purchaser. This is beyond question, for the language, in describing the ticket whose sale is prohibited, is: "As which shows that it was issued and sold below the standard schedule rate under contract with original purchaser entered upon such ticket and signed by the original purchaser."

As will be seen, this construction is reached largely from the use of the phrase "issued and sold" in the past tense. In other words, the construction insisted upon is arrived at by adhering to the true grammatical effect of those words, making them have reference to a past transaction.

This, however, is to single out a single phrase and give it such controlling force as to warp the entire act, when

in the argument of counsel it is admitted that "there can, of course, be no doubt that the purpose of this act is to destroy the business of ticket brokers." We know of no sound canon of construction which would warrant this. While it is true that, in arriving at the meaning of the legislature, primarily, the grammatical sense of the words used is to be adopted, yet if there is any ambiguity, or if there is room for more than one interpretation, the rules of grammar will be disregarded where a too strict adherence to them would raise a repugnance or absurdity, or would defeat the purpose of the legislature. *Garby* v. *Harris,* 7 Exch., 591; *Met Bo. Wks.* v. *Steed,* L. R. 82, B. Div., 445; *George* v. *B. of E.,* 33 Ga., 344; *State* v. *Heman,* 70 Mo., 441. Many cases might be cited in which the future tense has been read as including the present and the past, where that was necessary to carry out the meaning of the legislature. Thus an enabling act relating to married women who "shall come into the State" may apply to one who came into the State before the passage of the law. *Maysville & L. R. Co.* v. *Herrick,* 13 Bush. (Ky.), 122. Where an act provided that certain land "shall be allotted for and given to" an individual named, it was held that the words passed an immediate interest. *Rutherford* v. *Green,* 2 Wheat. (U. S.), 196, 4 L. Ed., 218. In *Babcock* v. *Goodrich,* 47 Cal., 488, the phrase "current expenses of the year" was made to read, "expenses of the current year"; it being evident that the latter form of words more cor-

116 Tenn.—32

rectly expressed the legislative intent.  These cases are but a recognition of an old and well-established rule of the common law, applicable to all written instruments, that *"verba intentioni, non e contra, debent inservire;"* that is to say, words ought to be more subservient to the intent, and not the intent to the words.  Black on Interpretation of Laws, section 34.

It will be found that this court has had occasion frequently to apply this rule of construction.  One phase of the rule has been used for the purpose of saving statutes, the constitutionality of which was called in question.  In such cases it has been held that where a statute will admit of two constructions, one that would make the statute void on account of conflict with the constitution, and another that would render it valid, the latter will be adopted, even though the former at first view be the more natural interpretation of the language used. *Cole Mfg. Co.* v. *Falls*, 90 Tenn., 469, 16 S. W., 1045; *State, ex rel.,* v. *Schlitz Brewing Co.,* 104 Tenn., 715, 59 S. W., 1033, 78 Am. St. Rep., 941.

We agree with the counsel that there is no doubt that the legislature intended by this act to destroy the business of ticket brokers, and to so construe it as to make it possible for common carriers, or their authorized agents, to engage in this business, would do violence to this intention.  We do not think that there is any rule which demands a construction leading to this result.  To the contrary, we are satisfied, giving the terms used a natural construction, that the act means, in the words of the

Samuelson v. State.

counsel for the State, "that common carriers and their authorized agents can sell to an original purchaser a contract-signature ticket, and that the common carrier, through its agent, can repurchase by redemption such ticket so originally sold, and that the extent to which it authorizes common carriers and their agents to traffic in nontransferable signature tickets is in the original sale and in the redemption.

We are satisfied, after considering the many objections urged to this act, that no one of them is well taken. We think it is in no respect violative of the State or federal constitutions. It follows, therefore, that the judgment of the lower court is affirmed.