GENERAL CARE
CORPORATION, Appellee,

v.

Martha B. OLSEN, Commissioner of
Revenue, Appellant.

Supreme Court of Tennessee,
at Nashville.

Feb. 24, 1986.

Charles L. Lewis, Deputy Atty. Gen., Nashville (W.J. Michael Cody, Atty. Gen., Nashville, of counsel), for appellant.

Charles A. Trost, Waller Lansden Dortch & Davis, William H. Neely, Waller Lansden Dortch & Davis, Nashville, for appellee.

OPINION

FONES, Justice.

Plaintiff, General Care Corporation, initiated this action in the Davidson County Chancery Court to recover state excise taxes paid under protest together with interest thereon from the date of payment. The chancellor entered judgment for plaintiff, and the defendant, the Commissioner of Revenue, appealed to this Court pursuant to T.C.A. § 16-4-108.

This appeal presents a single issue for review: whether capital gains from the sale of assets as a part of a corporate liquidation constitute "business earnings" within the meaning of T.C.A. § 67-4-804(a)(1), as the Commissioner contends, or

"non-business earnings" within the meaning of T.C.A. § 67–4–804(a)(5), as plaintiff contends. The chancellor found the capital gains in question to be "non-business earnings."

The relevant facts are not in dispute. Plaintiff's predecessor in interest, the original General Care Corporation, was incorporated in Tennessee in 1968. During its existence the original General Care built four nursing homes and seven hospitals. It sold two of the nursing homes to private individuals, retained ownership of one, and converted one into a hospital. Four subsidiaries of the original General Care owned and operated the eight hospitals, five of which were located in Tennessee and three of which were located out of state, in Alabama, Georgia and Florida respectively. Neither the original General Care nor any of its subsidiaries ever sold a hospital outright to an unrelated third party, although minority interests ranging from 6½% to 49½% of the hospitals' real and personal property were sold to physicians on the staffs of seven of the hospitals. In 1980, the original General Care agreed to be acquired by Hospital Corporation of America [HCA]. To accomplish this, the original General Care caused its four hospital management subsidiaries to be liquidated and their assets distributed to it as a parent corporation.[1] HCA purchased the interests of the original General Care shareholders for cash, and the original General Care was merged with a subsidiary of HCA known as HCA Acquisitions. HCA Acquisitions, the surviving corporation, then changed its name to General Care Corporation. This latter General Care succeeded to all the assets and liabilities of the original General Care and its subsidiaries, and is the plaintiff herein.

The parties to the merger obtained a private ruling from the Internal Revenue Service that for federal income tax purposes the transaction should be treated as a tax-free sale of assets by the original General Care to HCA Acquisitions pursuant to an I.R.C. § 337 liquidation plan, followed by complete liquidation of the original General Care and a taxable distribution to its shareholders of its assets. Tennessee requires the proceeds of I.R.C. § 337 sales to be recognized as "net earnings" under T.C.A. § 67–4–805 for state excise tax purposes, and accordingly, plaintiff filed with the Franchise and Excise Division of the Tennessee Department of Revenue a final excise tax return reflecting a capital gain of $61,306,126 for the period May 1, 1980 to September 4, 1980.

Plaintiff took the position that the capital gains were "non-business earnings" as defined in T.C.A. § 67–4–804(a)(5), and in accordance with T.C.A. § 67–4–810, allocated $35,512,050 to Tennessee and the balance of $25,794,076 among Alabama, Georgia and Florida. Plaintiff made a tentative tax payment of $2,641,000 based on estimated figures which it later revised. Plaintiff subsequently filed a claim for refund of $419,194 plus interest, contending that the amount of tax it owed was $2,221,806. The Commissioner took the position that the capital gains were "business earnings" within the meaning of T.C.A. § 67–4–804(a)(1). Based on the apportionment formula contained in T.C.A. § 67–4–811(a), the Commissioner determined the correct amount of tax to be $2,796,318.71, notified plaintiff of the deficiency, and demanded payment. Plaintiff paid involuntarily and under protest the sum of $201,076.21, which represented the assessed deficiency of $155,318.71 plus interest.

---

**1.** The four original General Care subsidiaries which owned and operated the hospitals were known as General Care Equities, Inc., a Tennessee corporation; General Care Corp. of Alabama, an Alabama corporation; General Care Corp. of Georgia, a Georgia corporation; and General Care Corp. of Florida, a Florida corporation. The original General Care also established Judy's Foods, Inc., a subsidiary which engaged in the fast food business, and General Care Investments, Inc., a subsidiary which financed the construction of hospitals and the purchase by physicians of minority percentage interests in those hospitals. The latter two subsidiaries were not liquidated as a part of the merger. Instead they remained intact and were purchased by HCA Acquisitions. Their activities have no bearing upon the instant case.

Tennessee's excise tax on corporate earnings, enacted in 1976 and presently codified at T.C.A. § 67–4–801, *et seq.*, is taken from the Uniform Division of Income for Tax Purposes Act [UDITPA], a model act prepared by the National Conference of Commissioners on Uniform State Laws. Under the Act, a corporation doing business in several states must divide its income among those states for tax purposes. T.C.A. § 67–4–809. The method by which corporate income is divided depends upon whether the income is classified as "business earnings" or "non-business earnings." [2] T.C.A. § 67–4–804(a) defines the terms in the following manner:

67–4–804. *Miscellaneous definitions.* —(a) As used in this part, unless the context otherwise requires:

(1) "Business earnings" means earnings arising from transactions and activity in the regular course of the taxpayer's trade or business and includes earnings from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations...

(5) "Nonbusiness earnings" means all earnings other than business earnings...

Income classified as "business earnings" is "apportioned" under T.C.A. § 67–4–811. Apportionment takes all the corporate income and divides it among the various states in which the taxpayer operates according to a three-factor formula that takes into account the corporation's property, payroll, and sales. Income classified as "non-business earnings" is generally traced to its source in a particular state and "allocated" to that state under T.C.A. § 67–4–810. In the case at bar, a larger portion of the gains would be attributed to Tennessee under the apportionment formula than under the allocation method.

In other jurisdictions the UDITPA definition of "business income" has given rise to two different judicial interpretations. Sev-

eral courts have employed what has been termed the "transactional test" in determining whether income is to be classified as business income or non-business income. The transactional test is rooted in the statutory phrase, "earnings arising from transactions and activity in the *regular course* of the taxpayer's trade or business." [Emphasis added.] One court has held that the phrase refers to "[b]usiness deals and the performance of a specific function in the normal, typical, customary, or accustomed policy or procedure of the taxpayer's trade or business." *Champion Int'l Corp. v. Bureau of Revenue,* 88 N.M. 411, 540 P.2d 1300, 1303 (App.1975).

Thus, under the transactional test, the "controlling factor by which business income [is identified] is the nature of the particular transaction giving rise to the income." *Western Natural Gas Co. v. McDonald,* 202 Kan. 98, 446 P.2d 781, 783 (1968). The frequency and regularity of similar transactions and the former practices of the business are pertinent considerations. *Atlantic Richfield Co. v. State,* 198 Colo. 413, 601 P.2d 628, 631 (1979); *Western Natural Gas,* 446 P.2d at 784.

Another relevant inquiry concerns the taxpayer's subsequent use of the income. Under the transactional test, earnings held for use in the regular course of on-going business operations or expended to acquire assets to be used in the regular course of future business activities, have been held to be properly apportionable as business income. *Champion Int'l,* 540 P.2d at 1304, *Sperry & Hutchinson Co. v. Department of Revenue,* 270 Or. 329, 527 P.2d 729, 731 (1974). Conversely, the sale of all of a company's assets as a part of a plan of complete liquidation has been held under the transactional test to give rise to non-business income, on the ground that such a transaction was of an extraordinary nature, outside the scope of the regular course of business operations. *Western Natural Gas,* 446 P.2d at 784; *McVean &*

---

**2.** The model act uses the word "income" instead of "earnings." No significance is attached to

this variation.

*Barlow, Inc. v. New Mexico Bureau of Revenue,* 88 N.M. 521, 543 P.2d 489 (App. 1974).

Other jurisdictions have concluded that the UDITPA definition of "business earnings" contains an alternative "functional test" by which earnings may be categorized as business income. Adherents of the functional test focus on the statute's second clause: "... earnings from tangible and intangible property if the acquisition, management, and disposition of the *property* constitute *integral parts* of the taxpayer's regular trade or business operations." [Emphasis added.] Whereas proponents of the transactional test treat this clause as clarifying language which merely modifies the substantive part of the definition, proponents of the functional test contend that it creates an independent test by which income may be classified.

Under the transactional test, the use or function of an asset in the taxpayer's business is not a determinative criterion, *Western Natural Gas,* 446 P.2d at 783, but under the functional test, the income from the sale of an asset will be considered business income if the asset produced business income while it was owned by the taxpayer. *District of Columbia v. Pierce Assocs., Inc.,* 462 A.2d 1129, 1131 (D.C. App.1983) illustrates: "If the property had an integral function in the taxpayer's unitary business, its income properly can be apportioned and taxed as business income, even though the transaction itself does not reflect the taxpayer's normal trade or business [footnote omitted]." Under the functional test, "the extraordinary nature or the infrequency of [a] transaction ... is irrelevant," *Atlantic Richfield,* 601 P.2d at 631, and so no significance is attached to liquidation.

In the instant case, the chancellor stated his conclusions as follows: The Tennessee General Assembly ... enacted the "transaction" test as its definition of business earnings ... [so] this Court does not have the authority to adopt a different test than that enacted by the Legislature in T.C.A. § 67–4–804(a)(1).

The Commissioner argues that it was not the intent of the General Assembly to adopt the transactional test. She maintains that jurisdictions which utilize the functional test purport to base their approach as squarely upon the UDITPA definition of business income as do advocates of the transactional test. The Commissioner urges this Court to adopt the functional test expressly. She contends that we effectively did so, albeit not by name, in *Tennessee Growers Inc. v. King,* 682 S.W.2d 203 (Tenn.1984).

We do not agree with the Commissioner's latter contention. In *Tennessee Growers,* plaintiff's predecessor in interest filed a federal tax return upon its liquidation reporting gross income attributable to recapture depreciation previously taken. At issue was whether the depreciation recaptured was within the statutory definition of "net earnings" for state excise tax purposes. We held recapture of depreciation to be "net earnings" not exempt from taxation under the laws of this State, and went on to comment:

> This income, in our opinion, should properly be classed as "business earnings." ... Property subject to "recapture of depreciation" is generally limited to personal property used in trade or business or held for the production of income. The assets distributed on liquidation by [plaintiff's predecessor in interest] would not have been subject to the "recapture of depreciation" provision of the Internal Revenue Code unless they had been used in [plaintiff's predecessor's] business operations. Consequently, the recapture of depreciation would be "business earnings" as that term is defined. *Id.* at 206.

The characterization of plaintiff's "net earnings" as "business" or "non-business" earnings was not the issue before us in *Tennessee Growers,* and we qualified the remarks on which the Commissioner relies by noting, "[I]f the recapture of depreciation were to be classed as 'non-business earnings' it would still constitute taxable income for excise tax purposes." *Id. Ten-*

*nessee Growers* is therefore not dispositive of the instant case.

In *Holiday Inns, Inc. v. Olsen,* 692 S.W.2d 850 (Tenn.1985), we held interest earned on the investment of working capital in short-term securities to be business income apportionable among the several states in which the taxpayer did business. In *Holiday Inns,* the taxpayer's primary business was the operation of hotels and restaurants. The taxpayer's surplus working capital funds were customarily placed in various money market instruments until needed. The taxpayer regularly withdrew funds from the accounts whenever its cash flow became insufficient to meet its needs.

Although the Commissioner contended that interest earned on working capital should be considered non-business earnings, we found instead that "[t]he interest earnings ... arose from transactions and activity in the regular course of the plaintiff's business, and the acquisition, management, and disposition of the funds constitute[d] an integral part of the taxpayer's regular business operations." *Id.* at 854. We reasoned that Holiday Inns' investment activity was a normal, typical, and accustomed part of its usual business practice. *Id.* at 853–54, citing with approval *Champion Int'l.,* 540 P.2d 1300, *Sperry & Hutchinson,* 527 P.2d 729, *Cin. N.O. & T.P. Ry. v. Kentucky Dept. of Revenue,* 684 S.W.2d 303, 305 (Ky.App.1984). The analysis employed in *Holiday Inns* is equally applicable to the case at bar.

■ We find the Commissioner's position that the "disposition" of property need not be within the scope of the taxpayer's regular business operations in order to give rise to business income contrary to the plain language of the statute. The drafters' use of the conjunction "and" clearly indicates that the disposition, as well as the acquisition and management of property must be an integral part of the taxpayer's regular trade or business operations in order to produce business earnings. This Court will presume that every word used in a statute was intended by the General Assembly to convey meaning and purpose. *Marsh v.*

*Henderson,* 221 Tenn. 42, 424 S.W.2d 193, 196 (1968). "Where, as here, in a legislative act, words are used in a series, effect must be given to every word, and it must be presumed that the Legislature did not use three words where one would do...." *R.J. Reynolds Tobacco Co. v. Carson,* 187 Tenn. 157, 213 S.W.2d 45, 48 (1948). It is the duty of the Court "to construe a statute so that no part will be inoperative, superfluous, void, or insignificant ... and further to give effect to every word, phrase, clause and sentence of the act in order to carry out the legislative intent." *Tidwell v. Collins,* 522 S.W.2d 674, 676–77 (Tenn.1975).

■ Plaintiff concedes that the hospital properties sold, and even the acquisition and management of those properties, were integral to the regular business conducted by the four hospital management subsidiaries of the original General Care. However, the evidence leads us to the conclusion that the disposition of the hospital property was not an integral part of the taxpayer's regular trade or business. As previously noted, it was stipulated that neither the original General Care nor any of its subsidiaries had ever sold a hospital prior to the merger. The hospital sales in question were in complete liquidation and served to terminate regular business operations.

Our opinion in this regard is reinforced by the decisions of our sister states which have held that the disposition of assets as a part of a corporate liquidation is not within the taxpayer's regular business activities, and therefore produces non-business income.

In *Western Natural Gas Co. v. McDonald,* 202 Kan. 98, 446 P.2d 781 (1968), the Kansas court addressed a situation factually similar to the case at bar. In *Western Natural Gas,* the taxpayer engaged in various facets of the development and marketing of petroleum products. The company held substantial acreage of oil and gas leases in Kansas from 1947, when it began business operations in that state, until 1963, which the company underwent a complete liquidation. Western realized capital

gains of over eight million dollars on the sale of its oil and gas leases. The court found that the leases were held for exploration and production and not for resale, and held that the income realized upon the sale of the leases was not business income under the UDITPA definition. The court went on to state:

> The present sale of leases cannot be considered made in the regular course of business operations. This sale by Western included all of its assets. A complete plan of liquidation was carried out requiring the affirmative vote of its stockholders. The sale was not made in the regular course of business when measured by its former practices. It had not sold oil and gas leases. The sale contemplated cessation rather than operation of the business. *Id.* at 784.

A similar result was reached by the New Mexico court in *McVean & Barlow, Inc. v. New Mexico Bureau of Revenue,* 88 N.M. 421, 543 P.2d 489 (App.1974), in which the taxpayer was a corporation engaged in the business of laying pipeline of two varieties, small diameter (little-inch work) and large diameter (big-inch work). In 1973, the corporation underwent a major reorganization and liquidated the big-inch pipeline business. The pipeline equipment was sold by auction, and the proceeds derived from the sale were held to be non-business income. The court noted that the liquidation transaction in question was a very unusual transaction that would occur only once in a company's history, and held:

> [T]axpayer was not in the business of buying and selling pipe line equipment, and, in fact, the transaction in question was a partial liquidation of taxpayer's business and a total liquidation of taxpayer's big-inch business. The sale of equipment did not constitute an integral part of the regular trade or business operations of the taxpayer. This sale contemplated a cessation of taxpayer's business. *Id.* at 492.

We find the reasoning underlying these cases to be persuasive. We have observed that:

It is axiomatic that a purpose in enacting uniform laws is to achieve conformity, not uniqueness. While opinions by courts of sister states construing a uniform act are not binding upon this court, we are mindful that the objective of uniformity cannot be achieved by ignoring utterances of other jurisdictions. This court should strive to maintain the standardization of construction of uniform acts to carry out the legislative intent of uniformity. This does not mean that this court will blindly follow decisions of other states interpreting uniform acts but, this court will seriously consider the constructions given to comparable statutes in other jurisdictions and will espouse them to maintain conformity when they are in harmony with the spirit of the statute and do not antagonize public policy of this state. *Holiday Inns,* 692 S.W.2d at 853.

The Commissioner brings to our attention several cases which have indeed held that the UDITPA definition of business income contains no requirement that the disposition giving rise to the gain must itself occur in the regular course of a taxpayer's trade or business. *Pierce Assocs.,* 462 A.2d at 1131, *Appeal of Calavo Growers of Cal.,* CCH State Tax Rep., ¶¶ 400–673 (Cal. State Bd. of Equalization, Feb. 28, 1984), *Appeal of Borden Inc.,* CCH State Tax Rep., ¶¶ 205–616 (Cal. State Bd. of Equalization, Feb. 3, 1977). However, none of the cases relied upon by the Commissioner involve transactions in complete liquidation, and it would appear that the income realized in each instance was utilized in the taxpayer's continued unitary business. In contrast, "in the peculiar context of a liquidation there is no business which the sale or property can benefit." *McVean & Barlow,* 543 P.2d at 492–93 (Lopez, J. dissenting). *See also Qualls v. Montgomery Ward & Co.,* 266 Ark. 207, 585 S.W.2d 18, 26 (1979) (dictum).

The Commissioner would have us hold that the disposition of property is integral to the taxpayer's "regular" trade or business operations if such a transaction

merely arises out of the taxpayer's business operations, however sporadically. *See Pierce Assocs.*, 462 A.2d at 1131. We have consistently held that the courts are restricted to the natural and ordinary meaning of the language used in a statute unless an ambiguity requires resort elsewhere to ascertain legislative intent. *Roddy Mfg. Co. v. Olsen*, 661 S.W.2d 868, 871 (Tenn.1983), *Austin v. Memphis Publishing Co.*, 655 S.W.2d 146, 148 (Tenn.1983), *State v. Hinsley*, 627 S.W.2d 351, 354 (Tenn.1982).

With this limitation in mind, we note that the word "regular" is defined in Webster's Third New International Dictionary as "steady or uniform in course, practice, or occurrence, not subject to unexplained or irrational variations; steadily pursued, ... returning, recurring, or received at stated, fixed or uniform intervals." Quoted in *Western Natural Gas*, 446 P.2d at 784, *Champion Int'l*, 540 P.2d at 1303. In our opinion, the interpretation espoused by the Commissioner places an artificial and strained construction upon the language of the statute. Words employed by the General Assembly are not to be given a "forced or subtle construction." *Foley v. Hamilton*, 659 S.W.2d 356 (Tenn.1983).

We likewise reject the Commissioner's argument that income from the sale of property is to be considered business earnings if the property sold constituted an integral part of the taxpayer's business. This Court has long held that statutes are to be construed in their entirety and in accordance with grammatical rules if possible. *Burks v. State*, 194 Tenn. 675, 254 S.W.2d 970 (1952), *Samuelson v. State*, 116 Tenn. 470, 95 S.W. 1012 (1906). In our opinion the Commissioner disregards the statute's clear grammatical structure by attempting to make the word "property" the subject of the clause upon which she bases her argument. The literal terms of the statute cannot be read to make the integral role of an asset in the taxpayer's business the controlling factor by which business earnings are identified without doing violence to the elementary rules of grammar. The language the Commissioner relies upon cannot be lifted out of its context and construed without reference to the balance of the statute. *Federal Express Corp. v. Woods*, 569 S.W.2d 408, 410 (Tenn.1980), *State ex rel. Rector v. Wilkes*, 222 Tenn. 384, 436 S.W.2d 425, 427 (1968), *Rose v. Blewett*, 202 Tenn. 153, 303 S.W.2d 709, 713 (1957).

We find nothing in the language of the statute itself to indicate that the General Assembly intended to create alternative tests as the Commissioner suggests. We conclude that the chancellor properly found the capital gains at issue here to be "non-business earnings" within the meaning of T.C.A. § 67–4–804(a)(5). The chancellor's decree is accordingly affirmed. Costs of this appeal are assessed against defendant.

BROCK, C.J., COOPER and HARBISON, JJ., and CANTRELL, Special Justice.