MURDOCK, Justice.
The Alabama Department of Revenue (“the Department”) petitioned this Court for a writ of certiorari to review the judgment of the Court of Civil Appeals in favor of Kimberly-Clark Corporation (“KC”) and Kimberly-Clark Worldwide, Inc. (“KCW”) (collectively referred to as “the companies”). See Kimberly-Clark Corp. v. Alabama Dep’t of Revenue, 69 So.Sd 135 (Ala.Civ.App.2008). The Court of Civil Appeals concluded that income derived from the companies’ sale of a “pulp/paper mill” (“the Coosa mill”) and approximately 375,000 acres of timberland (the Coosa mill and the Coosa timberland are sometimes referred to collectively as “the Coosa properties”) should be classified as “business income” under Art. IV, l.(a), of the Multi-state Tax Compact, codified at § 40-27-1 et seq., Ala.Code 1975,[1] for purposes of taxation. We granted the petition, and we now reverse the judgment of the Court of Civil Appeals.

I. Facts and Procedural History

During the companies’ tax years at issue, 1996-1998 (“the audit years”), KC was primarily engaged in the manufacture and sale of tissue and paper-related consumer products. It also was engaged in other businesses and owned numerous subsidiaries involved in other businesses. During the audit years, KC and its subsidiaries operated in 42 countries, employed approximately 60,000 employees, and generated annual sales of $12 to $13 billion.
In 1962, KC purchased the Coosa properties. KC harvested the trees from the Coosa timberland to make pulp for use in the Coosa mill. KC owned and operated the Coosa properties for 34 years, until 1996; production from the Coosa properties constituted the majority of KC’s pulp production.
In the early 1990s, KC decided to implement a shift in corporate strategy that would emphasize its consumer products rather than its own manufacturing and processing of raw materials. As a 1996 corporate report explained:
“In 1992, [KC] was widely diversified. We were a consumer products company, to be sure, but we also owned paper and forest products operations and an air *146 line. All these businesses were profitable, but in mapping our strategy for long-term sustainable growth, we concluded it lay in building on basic strengths: our core technologies, our well-known trademarks and our consumer product franchises. Businesses that did not — or could not — build on those strengths would be candidates for divestiture. Those that fit into our strategy would merit further investment and support. Outside businesses that fit into our strategy became acquisition candidates.”
As part of its long-term strategy, KC acquired Scott Paper Company, Inc. (“Scott Paper”), in late 1995. Scott Paper became a wholly owned subsidiary of KC in December 1995 and changed its name to Kimberly-Clark Tissue Company (“KCTC”) in February 1996. Scott Worldwide, Inc. (“SWI”), was a wholly owned subsidiary of Scott Paper when it merged with KC. SWI owned and managed approximately 995,000 acres of timberland in Nova Scotia, Canada.
In November 1996, KC formed KCW as a subsidiary of KCTC. In its opinion, the Court of Civil Appeals states that the primary purpose for forming KCW was to acquire, manage, and sell timberland.[2] KCW also owned and operated manufacturing facilities in Utah and California. SWI merged into KCW in November 1996. KC also simultaneously transferred the Coosa timberland to KCTC, and then to KCW. KCW thus owned both the Coosa timberland and the 995,000 acres of Nova Scotia timberland previously owned by SWI. KCW employees that previously worked for SWI continued to oversee and manage the Nova Scotia timberland. KCW contracted for KC employees to manage the Coosa timberland.
Part of KC’s shift in corporate strategy involved reducing its dependency on internal pulp production from 80 percent to 30 percent. To that’ end, in October 1996, KC began negotiations to sell its Coosa properties to Alliance Forest Products, Inc. (“Alliance”). In March 1997, KC completed the sale of its Coosa mill and the adjacent Coosa timberland to Alliance for $600 million. KCW received $350 million for the Coosa timberland. KC received the balance of $250 million for the Coosa mill. KC and Alliance also agreed to a five-year supply contract. The contract called for KC to purchase pulp produced by Alliance at the Coosa mill for use in KC’s paper products.
Also in furtherance of its corporate strategy, KC acquired and disposed of various other businesses or business segments. It acquired five “non-pulp/paper” businesses and sold nine such businesses during the audit years. KC sold two pulp and paper mills in the early 1990s and sold a second mill, in addition to the Coosa mill, during the audit years. KC also retained and operated seven pulp/paper mills during those years, and-it acquired five more pulp/paper mills after those years. Consequently, as of 2002, it owned and operated 12 pulp/paper mills in the United States.
KCW likewise engaged in several timber-related transactions during and after the audit years. KCW acquired or disposed of 30 parcels of timberland during the audit years. These included like-kind exchanges and small cash sales of timberland. KCW engaged in 7 like-kind exchanges in 1996, 3 in 1997, and 7 in 1998, for a total of 17 like-kind exchanges during the audit years. It engaged in 2 small cash sales in 1996, 10 in 1997, and 1 in 1998, for a total of 13 small-cash sales during the audit years. In 1998, KCW *147 acquired 520,000 acres of timberland in Mobile; it sold that property in 1999. As of 2002, KCW still owned and managed the 995,000 acres of timberland in Nova Scotia.
KC and KCW reported the gross receipts from the sale of the Coosa mill and the Coosa timberland, respectively, as ap-portionable “business income” on their 1997 Alabama corporate-income-tax returns. They did so under the auspices of the Multistate Tax Compact, codified at § 40-27-1 et seq., Ala.Code 1975, which provides for the apportionment or allocation of the income of corporations subject to tax in more than one state. “Business income,” as defined and discussed in Part III of this opinion, is apportioned among the various states in which the corporation does business, using a three-factor formula that considers the value or amount of the corporation’s property, payroll, and sales. “Nonbusiness income” from the sale of real property and other capital assets is allocated to the state in which the real property or capital assets are located.
The companies, however, excluded the gross receipts from the sale of the Coosa properties from their respective apportionment sales factors, purportedly under a “special rule” promulgated by the Department. This “special rule” in respect to the sales factor of the apportionment formula states that if “substantial amounts of gross receipts arise from an incidental or occasional sale of a fixed asset used in the regular course of the taxpayer’s trade or business, those gross receipts shall be excluded from the sales factor.” Ala. Admin. Code (Dep’t of Revenue), regulation 810-27 — 1—4—. 18 (3) (a).
The Department initially accepted KC’s and KCW’s classification of the gross receipts as apportionable business income, but it disallowed the exclusion of the gross receipts from the sales factors pursuant to the special rule. It similarly made other adjustments that have not been contested. The Department notified KC that KC was due a reduced tax refund of $147,649 for the audit years and billed KCW for additional taxes and interest for those years in the amount of $3,372,129.
KC and KCW filed petitions for review with the Department arguing that although the gross receipts for the sale of the Coosa properties were in the nature of business income, the receipts should be excluded from their sales factors pursuant to the special rule. KC and KCW argued, in the alternative, that the sale receipts constituted nonbusiness income and should be allocated 100 percent to Texas, KC and KCWs state of commercial domicile. The Department accepted KC and KCWs alternative argument that the income from the sale of the Coosa properties was non-business income. Instead of allocating the income to their state of commercial domicile, however, the Department allocated it entirely to Alabama pursuant to Ala.Code 1975, § 40-27-1, Art. IV, 6.(a). The Department consequently assessed taxes of $7,382,559 and $13,593,834 against KC and KCW, respectively.
The companies sought a hearing before an administrative law judge (“ALJ”). The ALJ entered an order agreeing with KC and KCW as to the characterization of the gross receipts in question as business income, but rejected the application of a special allocation rule that excluded the sales proceeds from the apportionment sales factor pursuant to Ala. Admin. Code (Dep’t of Revenue), regulation 810-27-1-4-.18(3)(a).[3] The Department appealed to the Montgomery Circuit Court, arguing that the gross receipts should be treated as nonbusiness income allocable solely to *148 Alabama; the companies cross-appealed, challenging the AJLJ’s determination that the special allocation rule did not apply.[4]
By joint motion, the parties stipulated to the admission into evidence of the record and the transcript made before the ALJ. After a hearing at which only counsel’s arguments were presented, the circuit court reversed the ruling of the ALJ. The court classified the gross receipts from the sale of the Coosa properties as nonbusiness income allocable solely to Alabama and upheld the Department’s final assessments, including interest, of $7,882,559 against KC and $13,593,834 against KCW. The circuit court did not reach the question of the special allocation rule because the rule does not apply to the apportionment of nonbusiness income. The companies appealed the circuit court’s judgment to the Court of Civil Appeals.
The Court of Civil Appeals reversed the circuit court’s judgment. It held that the gain from the sale of the Coosa properties was business income, and it remanded the cause for the circuit court to determine whether the special allocation rule is applicable. The Department petitioned this Court for a writ of certiorari, primarily contending that the decision of the Court of Civil Appeals conflicts with this Court’s opinion in Ex parte Uniroyal Tire Co., 779 So.2d 227 (Ala.2000), in which we examined in detail the definition of “business income” provided in Ala.Code 1975, § 40-27-1, Art. IV, 1.(a). We granted the petition.

II. Standard of Review

In the present case, the Court of Civil Appeals afforded the circuit court’s ruling no presumption of correctness. The Department frames the issue in this case as whether the gain from the companies’ divestiture of the Coosa properties arose from a transaction that was in the companies’ regular course of business. Because the “controlling factor” in such a determination is “the nature of the particular transaction giving rise to the income,” Uniroyal, 779 So.2d at 230 (quoting other cases), the Department contends that this is a question of fact disputed by the parties and that, therefore, the de novo standard of review is inapplicable in this case.
This argument fails because the facts in this case are not actually disputed. The circuit court received no testimonial evidence but decided the case on briefs and arguments of counsel and the record of the hearing before the ALJ. There is no dispute between the parties concerning how the divestiture occurred or what other transactions the companies engaged in during the period in question. The Department does not identify any dispute as to the facts but discusses only disputes as to the application of the law to the facts and, accordingly, the conclusions to be drawn from the facts. In the present case, “the nature of the transaction at issue” is not a question of fact, but a question of the application of the law to the undisputed facts. Thus, the correct standard of review is, as the Court of Civil Appeals concluded, the de novo standard.
“When reviewing a case in which the trial court sat without a jury and heard evidence in the form of stipulations, briefs, and the writings of the parties, this Court sits in judgment of the evidence; there is no presumption of correctness. Old Southern Life Ins. Co. v. Williams, 544 So.2d 941, 942 (Ala.1989); *149 Craig Constr. Co. v. Hendrix, 568 So.2d 752, 756 (Ala.1990). When this Court must determine if the trial court misapplied the law to the undisputed facts, the standard of review is de novo, and no presumption of correctness is given the decision of the trial court. State Dep’t of Revenue v. Garner, 812 So.2d 380, 382 (Ala.Civ.App.2001); see also Ex parte Graham, 702 So.2d 1215 (Ala.1997).”
Bean Dredging, L.L.C. v. Alabama Dep’t of Revenue, 855 So.2d 513, 516-17 (Ala. 2003).

III. Analysis

During the audit years, “business income” was defined in Ala.Code 1975, § 40-27-1, Art. IV, l.(a), as follows:
“[I]ncome arising from transactions and activity in the regular course of the taxpayer’s trade or business and includes income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer’s regular trade or business operations.”[5]
As the Court of Civil Appeals observed: “The uniformity sought by the [Multi-state Tax Compact] has been compromised by the judicial disagreement of different states over the definition of ‘business income.’ Two tests, the ‘transactional test’ and the ‘functional test,’ have developed as a result. The Alabama Supreme Court addressed this issue thoroughly in Ex parte Uniroyal [Tire Co., 779 So.2d 227 (Ala.2000) ].”
Kimberly Clark Corp., 69 So.3d at 139-40.
In Uniroyal, this Court defined the “transactional test” and the “functional test” and explained the differences between the two. Concerning the transactional test, the Court explained:
“Proponents of the transactional test find it ‘rooted in the statutory phrase, “earnings arising from transactions and activity in the regular course of the taxpayer’s trade or business.” ’ ‘Thus, under the transactional test, the “controlling factor by which business income [is defined] is the nature of the particular transaction giving rise to the income.” ... The frequency and regularity of similar transactions and the former practices of the business are pertinent considerations.’ ”
Uniroyal, 779 So.2d at 230 (quoting General Care Corp. v. Olsen, 705 S.W.2d 642, 644 (Tenn.1986), quoting in turn Western Natural Gas Co. v. McDonald, 202 Kan. 98, 101, 446 P.2d 781, 783 (1968) (citations and emphasis omitted)). Concerning the functional test, the Court explained:
“Other courts construing the same language have concluded that their statute also contains an alternative test, which is popularly known as the ‘functional’ test.... Proponents of the functional test find it rooted in that second clause of the statute, which reads: ‘and includes income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer’s regular trade or business operations.’ ‘More broadly [than under the transactional test], under the functional test, all gain from the disposition of a capital asset is considered business income if the asset disposed of was “used by the taxpayer in its regular trade or business operations.” ’ ”
779 So.2d at 230-31 (quoting Texaco-Cities Serv. Pipeline Co. v. McGaw, 182 Ill.2d 262, 269, 695 N.E.2d 481, 484, 230 Ill.Dec. *150 991, 994 (1998) (citations and emphasis omitted)).
The Uniroyal Court observed that ‘“[t]he functional test may seem reasonable as a matter of tax policy, but it is hard to extract it from the language of the statute,’ ” and thus concluded that Alabama’s statute embodies the transactional test for determining what constitutes “business income.” 779 So.2d at 234 (quoting P. Faber, When Does the Sale of Corporate Assets Produce Business Income for State Corporate Franchise Tax Purposes? The Tax Executive 179, 187 (May-June 1995)). In the course of so concluding, the Court noted that the term “regular” in the phrase “regular course of business” is defined as “ ‘steady or uniform in course, practice, or occurrence: not subject to unexplained or irrational variation: steadily pursued; orderly, methodical’; even as ‘returning, recurring, or received at stated, fixed or uniform intervals ...; functioning at proper intervals.’ Webster’s Third New International Dictionary of the English Language Unabridged 1913 (1971).” 779 So.2d at 236. In short, “the word, ‘regular’ in the phrase ‘regular course of the taxpayer’s trade or business’ refers to an ongoing business concern.” 779 So.2d at 236.
In concluding that the sale of the Coosa properties yielded “business income” for KC and KCW, the Court of Civil Appeals reasoned as follows:
“In this case, KC is, among other things, in the business of selling paper products whose manufacture requires raw material processed in mills and taken from timberlands. As timberlands are depleted, pulp-manufacturing facilities may become unprofitable. In addition, costs associated with paper mills and timberlands may cause a change in corporate strategy, taking the corporation in a new direction. It is not hard to imagine that the selling and acquisition of paper mills and timberlands, especially by a corporation that, among other things, sells paper products, would generate earnings arising from transactions and activities in the regular course of the corporation’s trade or business and would be an ongoing business concern. See Ex parte Uniroyal, 779 So.2d at 230-31, 236.
“Moreover, KC bought and sold major businesses and business components in the regular course of business during the 1990s pursuant to its long-term corporate strategy. Before that decade, KC had been widely diversified and had owned not only companies involved in the manufacture and sale of forest products, but also other companies, such as an airline. KC’s long-term strategy required KC to focus on its basic strengths, prompting it to acquire businesses that fit into that strategy and to sell businesses that did not. Although the sale of the Coosa Mill and the Coosa Timberlands may have been a large sale of a plant and of timberland, KC, acting through KCW, regularly bought and sold paper plants and timberlands, businesses, and business components. In addition, the sale of the Coosa Mill did not end KC’s active involvement in the pulp/paper business; it owned and operated 7 pulp/paper mills throughout the period between 1996 and 1998, and, at the time of the hearing before the ALJ, it owned and operated 12 mills. Income similarly generated from regularly buying and selling businesses was held in Atlantic Richfield [Co. v. State of Colorado, 198 Colo. 413, 601 P.2d 628 (1979) ], to be business income under the transactional test espoused by our Supreme Court in Ex parte Uniroyal [Tire Co., 779 So.2d 227 (Ala.2000) ], when, as in this case, the pertinent taxpayer regularly engaged in major acquisitions and *151 dispositions. Thus, under the authorities that we have discussed, the sale of the Coosa Mill and the Coosa Timber-lands is properly deemed a systematic and recurrent business practice that produced business income.
“We note that the Department argues that KCW was not engaged in the management of the Coosa Mill and the Coosa Timberlands, i.e., that it was not involved in the clearing of land and maintenance of roads in the Coosa Tim-berlands, and, therefore, the Department asserts that the transactional test should not apply to characterize the income KCW received from the sale as business income. KCW’s management function, however, was to hold title to timberlands and to oversee the sales and acquisitions of timberlands. KCW’s primary purpose was to acquire and to dispose of timberlands in the regular course of its business through like-kind exchanges and cash sales, which required it to hold title to those properties for those purposes. During the tax years at issue, KCW acquired or sold 30 small tracts of timberland in addition to the Coosa Timberlands; moreover, KCW similarly acquired title to 520,000 acres of Mobile timberland in 1998 and sold that land in 1999, and, for all that appears in the record, it still owns and manages 995,000 acres of timberland in Canada. Thus, the management of titles, purchases, and sales of tracts of timberland are part of KCW’s regular business. See Ex parte Uniroyal, 779 So.2d at 230-31, 236.
“Additionally, even if KC or KCW had not frequently engaged in the transactions discussed herein, the income from those transactions would still be considered business income. See Welded Tube [Co. of America v. Commonwealth of Pennsylvania, 101 Pa. Commw. 32, 515 A.2d 988 (1986) ]. In Welded Tube, the court held that a pipe manufacturer’s sale of a manufacturing facility resulted in business income, even though the manufacturer had bought and sold real property only twice in 30 years. The record indicated that KC and KCW had engaged in a number of business transactions during the 1996-1998 tax years alone.
“Like the sales transactions by the taxpayers in Atlantic Richfield, PPG [Industries, Inc. v. Department of Revenue, 328 Ill.App.3d 16, 765 N.E.2d 34, 262 Ill.Dec. 208 (2002)], and Welded Tube, the sale of the Coosa Mill and the Coosa Timberlands was performed in the regular course of KC’s and KCW’s business. The buying and selling of businesses and manufacturing facilities was in furtherance of their primary business of manufacturing and selling paper and paper-related products and their overall corporate strategy.”
Kimberly-Clark Corp., 69 So.3d at 142-43.
In reasoning as it did, the Court of Civil Appeals placed too much emphasis on the number of transactions other than the sale of the Coosa properties that occurred during and around the audit years and too little emphasis on “the nature of the particular transaction giving rise to the income.” Uniroyal, 779 So.2d at 230. The fact is that KC determined that the Coosa properties were “non-core” businesses that, under the standard recognized in Uniroyal, were not “essential to [its] business operations.” Uniroyal, 779 So.2d at 237. The sale of the Coosa properties was part of KC’s corporate strategy to shed entities that did not concentrate on its consumer-products businesses. At the time, KC was shifting its focus from being primarily a manufacturer and seller of consumer-paper products to becoming a global consumer-products company. More specifically, KC sought to reduce its de *152 pendence on internally produced pulp from 80 percent of its requirements to 30 percent, and it sold the Coosa properties in furtherance of this goal.
It is difficult to conceive how the sale of properties that had been operated by the company as part of its business for 34 years and were sold because of a new corporate strategy could be said to be in the “regular course of business” for KC. As the Uniroyal Court observed, “ ‘ “[i]f the transaction is an extraordinary one, it is hard to see how the disposition can constitute an integral part of the taxpayer’s regular trade or business.” ’ ” 779 So.2d at 234 (quoting brief of amicus curiae Committee on State Taxation, quoting in turn J. Hellerstein & W. Hellerstein, State Taxation ¶ 9.05[2][c] (3d ed. 1998)). In short, an alteration in the nature of a business is not something that occurs within “the regular course of [that] business.”
The Court of Civil Appeals noted that the sale of the Coosa properties “was in furtherance of [the companies’] primary business of manufacturing and selling paper and paper-related products and their overall corporate strategy” and thus concluded that the sale produced “business income.” Kimberly-Clark Corp., 69 So.3d at 143. Under such criteria, however, any business transaction would produce business income, because corporations by definition engage in transactions that are intended to further their primary business and overall corporate strategy. Part of the reason the Uniroyal Court rejected the functional test for determining what constitutes business income was that the test “is so broad that it essentially renders nugatory the transactional test.” Uniroyal, 779 So.2d at 235. The aforesaid reasoning of the Court of Civil Appeals does the same.
KC sold the Coosa properties for $600 million, easily its largest sale during the audit years. Not surprisingly, in their annual reports and SEC filings, the companies listed the sale as an “extraordinary gain.” It is true, as the ALJ noted, that “a company’s internal accounting techniques are not binding on a state for tax purposes,” Exxon Corp. v. Department of Revenue of Wisconsin, 447 U.S. 207, 221, 100 S.Ct. 2109, 65 L.Ed.2d 66 (1980), but in this case the companies’ designation represents their acknowledgment of the unusual nature of the transaction at issue. The companies correctly note that the statute does not state that a transaction producing a substantial income gain automatically falls outside the “regular course of business,” but this particular transaction liquidated major assets that KC had used for production purposes for 34 years. This, combined with the size of the transaction, is an indicator that the transaction was not part of the regular course of business for the companies.
The Uniroyal Court also stated that “ ‘[t]he frequency and regularity of similar transactions and the former practices of the business are pertinent considerations’ ” for determining whether a particular transaction yields business income. Uniroyal, 779 So.2d at 230 (other citations omitted). Substantial differences exist between the sale of the Coosa properties and the kind and number of other transactions cited by the companies as proof that this transaction occurred in the companies’ regular course of business. KC and KCW were not regularly engaged in buying and selling pulp-industry properties.[6] KC pur *153 chased only one paper mill during the audit years. Although it bought five “non-pulp/paper ” businesses and sold nine such businesses or business components during the audit years, most of those transactions occurred during its acquisition of Scott Paper. KCW’s sale of the Coosa timberland was one of only two substantial sales of timberland ever made by KCW. KCW’s other sales and exchanges of timberland at the time concerned tracts of between 800 and 1,500 acres of timber, whereas the Coosa timberland sale consisted of 375,000 acres of timber. These facts explain why the companies admit in their brief to this Court that their business transactions included “the occasional acquisition and disposition of pulp/paper mills, timberlands, and other business segments.” KC & KCW’s brief, at 25 (emphasis added).[7]
Though the frequency and regularity of similar transactions are not the sole determining factors in whether a gain should be classified as business income, they are helpful indicators for making such an assessment. The extraordinary nature of the transaction itself along with the lack of transactions similar in scope and kind demonstrates that the sale of the Coosa properties was not in the nature of a “steady or uniform” practice for the companies that recurred at “fixed or uniform intervals.” Uniroyal, 779 So.2d at 286. Instead, the sale was the premier example of KC’s shift in corporate strategy that entailed the liquidation of long-held major corporate assets. Similar to the complete liquidation at issue in Uniroyal, the companies’ sale of the Coosa properties was “most extraordinary [and did] not occur in the ‘regular course of the taxpayer’s trade or business.’ ” 779 So.2d at 236.
Ultimately, to label the gain from the sale of the Coosa properties as “business income,” this Court would have to look past the undisputed facts that the sale of the Coosa properties was the companies’ largest during the audit years and that KCW acquired or sold timberland of comparable size on only two other occasions throughout the 1990s. We would also have to ignore the reason for this sale, which was to drastically reduce KC’s internal pulp production in order to focus on other aspects of its business. There was a major shift in corporate strategy followed by a major transaction — different quantitatively and qualitatively from its other business transactions — to help achieve this goal. The sale of the Coosa properties was an extraordinary transaction that represented a divestiture by KC of a part of its business rather than a transaction conducted in the regular course of that business. Thus, the income gain from the sale of the Coosa properties cannot be categorized as “business income” under Ala.Code 1975, § 40-27-1, Art. IV, l.(a).
*154 Based on the foregoing, the judgment of the Court of Civil Appeals is reversed, and the cause is remanded for the reinstatement of the order of the circuit court upholding the Department’s final assessments against KC and KCW in this matter.
REVERSED AND REMANDED.
LYONS, WOODALL, STUART, SMITH, BOLIN, PARKER, and SHAW, JJ., concur.
COBB, C.J., dissents.

. Specifically, § 40-27-1.1 defines "business income.”

. But see infra note 6.

. The proper application of the special allocation rule is not at issue in the present petition.

. The Department contends for the first time in its reply brief that the companies did not, in fact, appeal the ALJ’s determination concerning the special allocation rule. We find this contention to be without merit. In any event, as we already have noted, the issue concerning the special allocation rule is not properly before us. See supra note 3.

. The Alabama Legislature adopted a new definition of "business income” in 2001, effective for tax years beginning after December 31, 2001. See § 40-27-1.1, Ala.Code 1975.

. The dissent notes, and the companies argue that the facts demonstrate, that KCW’s primary purpose was to acquire, manage, and dispose of timberland for KC. At least insofar as the Coosa timberland is concerned, however, the facts actually show that KCW was *153 merely a titie-holding company for the property: KC employees, not KCW employees, managed the Coosa timberland. Under the circumstances presented here, we cannot conclude that the transfer of the Coosa timberland to a wholly owned subsidiary, the purpose of which was merely to hold title and/or sell the property, if and when it is ever sold, automatically circumvents altogether the general difference recognized in the statute and in Uniroyal between income from a transaction conducted in the regular course of business and income from a transaction that is a sale of one’s business.

. The dissent states that “[n]othing in Uniroyal indicates that in determining whether a transaction is ‘extraordinary,’ one is to look at the size, scope, and price tag of the transaction; instead, it is the nature of the transaction that should be analyzed.” 69 So.3d at 155 (Cobb, C.J., dissenting). The size and scope of the transaction at issue here, especially when considered in conjunction with KC’s announced shift in corporate strategy, is indeed indicative of the "nature” of the transaction, i.e., as a sale of part of its business rather than a transaction in the normal course of its business.