312 P.3d 1143

**HARRIS CORPORATION and Consolidated Subsidiaries, Plaintiffs/Appellants,**

v.

**ARIZONA DEPARTMENT OF REVENUE, Defendant/Appellee.**

**No. 1 CA–TX 11–0006.**

Court of Appeals of Arizona, Division 1.

Nov. 26, 2013.

5. A retired judge of the Arizona Court of Appeals authorized and assigned to sit as a judge on the Court of Appeals, Division Two, pursuant to Ari-zona Supreme Court Administrative Order No. 2012–101 filed December 12, 2012.

Steptoe & Johnson, LLP, Phoenix By Pat Derdenger, Bennett Evan Cooper, for Plaintiffs/Appellants.

Arizona Attorney General's Office, Phoenix By Kimberly Cygan for Defendant/Appellee.

Bade Baskin Richards, PLC, Tempe By William A. Richards and Multistate Tax Commission, Washington, D.C. By Shirley Sicilian and Bruce J. Fort for Amicus Curiae Multistate Tax Commission.

## OPINION

GEMMILL, Judge.

¶ 1 The issue in this corporate taxation case is whether certain income constitutes "business income" or "nonbusiness income" under Arizona Revised Statutes ("A.R.S.") section 43–1131. The definition of "business income" in A.R.S. § 43–1131(1) is set forth in two clauses. We hold that Arizona may tax corporate income as "business income" if the income satisfies either definitional clause. Because the tax court correctly applied the statute to the facts, we affirm the tax court's grant of summary judgment to the Arizona Department of Revenue (the "Department").

## BACKGROUND

¶ 2 Harris Corporation ("Harris") is a Delaware corporation with its executive offices in Melbourne, Florida. It provides voice, data, and video telecommunications products and related services.

¶ 3 Harris and its subsidiaries ("Taxpayer") elected to file Arizona corporate income tax returns on a consolidated basis [1] pursuant to A.R.S. § 43–947(A) for tax years June 30, 1997 to June 30, 2001. Those returns reflect three categories of income at issue herein: (1) gains recognized on the contribution of assets to a joint venture with General Electric; (2) proceeds from the sale of the Lanier Medical Transcription business line; and (3) royalties received from patent rights acquired by Harris and held by Harris Semiconductor Patents, Inc. ("Harris Semiconductor"), along with income from the sale of

stock and other assets by Harris subsidiaries engaging in investment activities.

¶ 4 On its consolidated Arizona returns, Taxpayer treated the income, expenses, and losses from its business operations as "business income" but treated gains on the dispositions in question as "non-business income." Following an audit, the Department issued a notice of proposed assessment. Taxpayer protested, and appealed to the Arizona Tax Court in accordance with A.R.S. § 42–1254(C). The parties filed cross-motions for summary judgment on whether the proceeds of the transactions qualified as business income. The tax court granted summary judgment in favor of the Department and filed a formal judgment. Taxpayer timely appeals.

## ANALYSIS

### I. A.R.S. § 43–1131(1) Provides Two Alternative Clauses Describing "Business Income"

¶ 5 This court reviews the tax court's grant of summary judgment de novo. *Citizens Telecomm. Co. of White Mountains v. Ariz. Dep't of Revenue*, 206 Ariz. 33, 38, ¶ 20, 75 P.3d 123, 128 (App.2003). We also apply the de novo standard when reviewing the tax court's interpretation of statutes. *M.D.C. Holdings, Inc. v. State ex rel. Ariz. Dep't of Revenue*, 222 Ariz. 462, 467, 216 P.3d 1208, 1213 (App.2009).

¶ 6 Arizona imposes a corporate income tax "upon the entire Arizona taxable income of every corporation." A.R.S. § 43–1111; *see* A.R.S. § 43–102(A)(5) (corporations are subject to Arizona tax on income earned from sources within the state). When corporations conduct activities in multiple states, income must be apportioned or allocated among various states. In an effort to properly account for the income of such corporations, the Arizona Legislature enacted a modified version of the Uniform Division of Income for Tax Purposes Act ("UDITPA") in 1983. A.R.S. §§ 43–1131 to –1150; *see Walgreen Arizona Drug Co. v. Arizona Dep't of*

---

1. An affiliated group filing a consolidated return "is considered to be and shall be treated as a single taxpayer." A.R.S. § 43–947(F).

*Revenue,* 209 Ariz. 71, 72, ¶ 7, 97 P.3d 896, 897 (App.2004). Under UDITPA, business income is "generally 'apportioned' between the states in which the corporation does business using a formula defined in the statutes." *Arizona Dep't of Revenue v. Cent. Newspapers, Inc.,* 222 Ariz. 626, 629, ¶ 12, 218 P.3d 1083, 1086 (App.2009) (citing A.R.S. § 43–1139(A)). In contrast, "certain nonbusiness income is 'allocated' to designated states, based on factors such as the location of property and the taxpayer's commercial domicile." *Id.* (citing A.R.S. §§ 43–1134 to – 1138).

¶ 7 UDITPA apportions business income to this state through a formula for multi-state corporations using their property, sales, and payroll. *Walgreen,* 209 Ariz. at 72, ¶¶ 7–8, 97 P.3d at 897. Arizona allocates nonbusiness income, such as capital gains from the sale of intangible property and interest income, to the state in which the taxpayer is domiciled. A.R.S. §§ 43–1136(C), 43–1137; *see generally* 1 Jerome R. Hellerstein et al., State Taxation ¶ 9.01, at 9–7 n. 2 (3d ed.2009) (hereinafter *"Hellerstein"*) (" 'allocation' refers to the attribution of a particular type of income to a designated state, whereas 'apportionment' refers to the division of the tax base by formula"). Other nonbusiness income, such as net rents, royalties, and capital gains from the sale of real or tangible personal property, is allocated to the state where the property is located. A.R.S. §§ 43–1135(A), (B), 43–1136(A), (B).

¶ 8 Section 43–1131, A.R.S., defines "business income" and "nonbusiness income" as follows:

As used in this article, unless the context otherwise requires:

1. "Business income" means income arising from transactions and activity in the regular course of the taxpayer's trade or business and includes income from tangible and intangible property if the acquisition, management and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations.

\*       \*       \*

4. "Nonbusiness income" means all income other than business income.

¶ 9 The courts in several states adopting these UDITPA definitions have recognized that "business income" includes two alternative definitional clauses: the so-called "transactional" test from the first clause ("income arising from transactions and activity in the regular course of the taxpayer's trade or business"), and the so-called "functional" test from the second clause ("income from tangible and intangible property if the acquisition, management and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations"). *See, e.g., Texaco–Cities Serv. Pipeline Co. v. McGaw,* 182 Ill.2d 262, 230 Ill.Dec. 991, 695 N.E.2d 481, 484 (1998) (addressing definition of business income essentially identical to A.R.S. § 43–1131(1)). Because a number of courts and various commentators utilize these descriptors, we will also use them for convenience as shorthand references to the respective clauses of § 43–1131(1). We emphasize, however, that proper interpretation of § 43–1131(1) is based on the statutory language and not on the labels applied by others. And we caution against use of the terms "transactional" or "functional"—rather than the actual statutory language—to evaluate whether particular income should be categorized as business or nonbusiness income.

¶ 10 To constitute business income under the transactional test, the income must be produced by an activity in the regular course of the taxpayer's business operations. Under this test, the "controlling factor by which business income is identified is the nature of the particular transaction giving rise to the income." *Gen. Care Corp. v. Olsen,* 705 S.W.2d 642, 644 (Tenn.1986). The functional test describes business income as income from property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations. Courts have found that under the functional test, the focus is on the relationship between the asset and the business, and the extraordinary nature or infrequency of the sale is irrelevant. *See, e.g., Texaco–Cities,* 230 Ill.Dec. 991, 695 N.E.2d at 484–85.

¶ 11 Review of the case law indicates that courts are divided on the interpretation of this statute. Some courts hold that corporate income is business income if it satisfies either the transactional or the functional test. *Gannett Satellite Info. Network, Inc. v. State, Dep't of Revenue*, 348 Mont. 333, 201 P.3d 132 (2009); *Hoechst Celanese Corp. v. Franchise Tax Bd.*, 25 Cal.4th 508, 106 Cal. Rptr.2d 548, 22 P.3d 324 (2001); *Simpson Timber Co. v. Oregon Dep't of Revenue*, 326 Or. 370, 953 P.2d 366 (1998); *Texaco–Cities*, 182 Ill.2d 262, 230 Ill.Dec. 991, 695 N.E.2d 481; *Pledger v. Getty Oil Exploration Co.*, 309 Ark. 257, 831 S.W.2d 121 (1992); *Dist. of Columbia v. Pierce Assocs., Inc.*, 462 A.2d 1129 (D.C.1983). Other courts hold that there is one transactional test, and the second clause merely describes examples of income within the definition. *Phillips Petroleum Co. v. Iowa Dep't of Revenue*, 511 N.W.2d 608 (Iowa 1993) (superseded by Iowa Code § 422.32); *W. Nat'l Gas Co. v. McDonald*, 202 Kan. 98, 446 P.2d 781 (1968) (superseded by Kan. Stat. § 79–3271(a)); *Gen. Care Corp.*, 705 S.W.2d 642 (superseded by Tenn.Code Ann. § 67–4–2004).

■ ¶ 12 The parties and Amicus Multistate Tax Commission ("MTC") agree that the first clause of A.R.S. § 43–1131(1) imposes a transactional test. They disagree as to whether income, in order to qualify as business income, must always satisfy the functional requirements in the second clause. Taxpayer contends that the Department—by construing the clauses to provide alternate tests—has adopted an overly broad definition of "business income," thereby encompassing income that should be allocated to Florida and not taxed in Arizona.

¶ 13 The primary goal of statutory interpretation is to ascertain and implement the legislative intent. *Obregon v. Indus. Common*, 217 Ariz. 612, 614, ¶ 11, 177 P.3d 873, 875 (App.2008). "We look first to the plain language of the statute as the most reliable indicator of its meaning." *State v. Mitchell*, 204 Ariz. 216, 218, ¶ 12, 62 P.3d 616, 618 (App.2003) (citation omitted). "If the statute's language is clear and unambiguous, we give effect to that language and do not apply any other rule of statutory construction."

*Nordstrom, Inc. v. Maricopa Cnty.*, 207 Ariz. 553, 556–57, ¶ 10, 88 P.3d 1165, 1168–69 (App. 2004) (quoting *In re Maricopa County Superior Court No. MH 2001–001139*, 203 Ariz. 351, 353, ¶ 12, 54 P.3d 380, 382 (App.2002)). We "give the words used their ordinary meaning." *Ariz. Dep't of Revenue v. Raby*, 204 Ariz. 509, 511, ¶ 14, 65 P.3d 458, 460 (App.2003) (citation omitted).

¶ 14 The structure of the business income definition provides two separate clauses joined by the conjunction "and." A.R.S. § 43–1131(1). The definition is a compound sentence with two independent clauses that share "business income" as a common subject. The first clause provides a definition of business income focusing on the regularity of the transaction, and the second clause describes business income by focusing on the function of the business property from which the income is derived. We agree with the Department and Amicus that "the statute can be read as 'business income' *means* the first clause and 'business income' *includes* the second clause." *See Kroger Co. v. Dep't of Revenue*, 284 Ill.App.3d 473, 220 Ill.Dec. 566, 673 N.E.2d 710, 713–14 (1996). The statutory definition makes grammatical sense if the intended subject of each clause is "business income."

¶ 15 The statutory language suggests that the Arizona Legislature intended to address different economic realities in the two clauses. The general language of the first clause encompasses all activity in the regular course of the taxpayer's business. The second clause utilizes different language to include income from "property," as long as its "acquisition, management, and disposition" constitute "integral parts" of the taxpayer's business operations. The concept from the first clause—"in the regular course of the taxpayer's trade or business"—is replaced in the second clause with "integral parts of the taxpayer's regular trade or business operations." *See Kroger*, 220 Ill.Dec. 566, 673 N.E.2d at 714 (noting that the second clause discards "regular course of business" and thus contains a new definition, not a clarification). The two clauses use different language and therefore provide two distinct def-

initions of business income. *See Texaco–Cities,* 230 Ill.Dec. 991, 695 N.E.2d at 485.

¶ 16 Taxpayer argues that the conjunction "and" and the words "and includes" are words of limitation so that the second clause is merely a subset of the first clause. In making this argument, Taxpayer relies on cases that interpret the use of "includes" in statutes as denoting an illustrative relationship. *See, e.g., City of Peoria v. Brink's Home Sec., Inc.,* 226 Ariz. 332, 333, ¶ 7, 247 P.3d 1002, 1003 (2011). In *City of Peoria,* the Arizona Supreme Court addressed a statute containing the words "which include" at the beginning of an adjective clause that defined services that qualify as "interstate telecommunications services." The business income definition, in this case, has a significantly different structure. In this statute, the word "includes" is not used to begin a participle phrase or adjective clause, but rather as the verb of an independent clause. Section 43–1131(1) provides a compound definition of business income and the use of "includes" does not modify a noun, but is used as a verb in the second clause. The words "which include" used in *City of Peoria* do not mean the same as the words "and includes" used in § 43–1131(1). We do not agree with the Taxpayer that the second clause is simply a subset of the first clause. Instead, we conclude that § 43–1131(1) provides two alternative definitions of—or tests for—"business income."

¶ 17 Turning to the meaning of the second clause, we note that "integral" means "of, relating to, or serving to form a whole: essential to completeness." *Texaco–Cities,* 230 Ill.Dec. 991, 695 N.E.2d at 485 (citing Webster's Third New International Dictionary 1173 (1993)). The second clause therefore applies to income-producing property if the acquisition, management, and disposition of the property is essential or related to the taxpayer's regular trade or business. Furthermore, we agree with other courts in concluding that the words "acquisition, management, and disposition of the property" indicate "the myriad of ways that corporations may control and use the rights and privileges commonly associated with property ownership." *Hoechst,* 106 Cal.Rptr.2d

548, 22 P.3d at 338; *see also Texaco–Cities,* 230 Ill.Dec. 991, 695 N.E.2d at 485 (finding the "words 'acquisition, management, and disposition' suggest elements typically associated with the 'keeping' of corporate property"). Thus, interpreting the second clause in this light, the sale of property will constitute business income if the control and use of the property is closely related to the taxpayer's regular trade or business. The use of a property asset for the production of business income will "indisputably render[ ] that asset an integral part of the taxpayer's regular business operations." *Texaco–Cities,* 230 Ill.Dec. 991, 695 N.E.2d at 486. This functional test is consistent with our reading of the statute.

¶ 18 Taxpayer argues that the use of "and" in the second clause requires that the disposition as well as the acquisition and management of property must be integral parts of the taxpayer's regular trade or business. *See Gen. Care Corp. v. Olsen,* 705 S.W.2d 642, 646 (Tenn.1986) (concluding the use of "and" "clearly indicates that the disposition, as well as the acquisition and management of property must be an integral part of the taxpayer's regular trade or business operations"). The alternative construction, Taxpayer argues, converts "and" into "or."

¶ 19 The words "acquisition, management, and disposition" must be read in the context of the statute. *See Adams v. Comm'n on App. Ct. Appointments,* 227 Ariz. 128, 135, ¶ 34, 254 P.3d 367, 374 (2011) (statutory terms must be considered in context). In doing so, we conclude that these words do not establish three requirements that each must be integrally related to the taxpayer's business under the functional test. See *Jim Beam Brands Co. v. Franchise Tax Bd.,* 133 Cal.App.4th 514, 34 Cal.Rptr.3d 874, 881 (2005) (construing similar language in California's version of UDITPA and holding that "[t]his statutory language does not establish a requirement that each element—acquisition, management, and disposition—individually be integral to the taxpayer's regular trade or business before the proceeds from property will be held to be business income"). If the "acquisition, management, and disposition" must be regularly undertaken with re-

spect to an asset, such activities would also constitute transactions and activity in the regular course of business. This interpretation, therefore, would render the first clause superfluous. *See Williams v. Thude,* 188 Ariz. 257, 259, 934 P.2d 1349, 1351 (1997) (noting we construe statutes so as to avoid rendering portions of them superfluous); *Adams v. Bolin,* 74 Ariz. 269, 276, 247 P.2d 617, 621 (1952) (interpreting a statute to give each word, phrase and clause meaning so that no part will be void, inert, redundant, or trivial).

¶ 20 Giving effect to the independent definition in the second clause of § 43–1131(1) also comports with the legislative purpose included within the comments in UDITPA. Specifically, the comment to UDITPA section 1(a) provides: "[i]ncome from the disposition of property used in a trade or business of the taxpayer is includible within the meaning of business income." Unif. Div. of Income for Tax Purposes Act, 7A U.L.A. § 1(a) cmt. (1966). This language supports the principle that income from the disposition of property used in the trade or business is apportionable, even if it does not occur in the regular course of trade or business. *See Texaco–Cities,* 230 Ill.Dec. 991, 695 N.E.2d at 486 ("The adoption of the functional test also comports with the legislative history and purpose behind the Act."). In addition, our legislature has directed that Arizona's version of UDITPA should be "construed as to effectuate its general purpose to make uniform the law of those states which enact it." A.R.S. § 43–1149.

¶ 21 Furthermore, the Department's regulations are consistent with this interpretation of A.R.S. § 43–1131. Although not binding, the Department's regulations are entitled to considerable weight because the agency implements Arizona's UDITPA statutes. *See Arizona Dep't of Revenue v. Central Newspapers, Inc.,* 222 Ariz. 626, 629, ¶ 10, 218 P.3d 1083, 1086 (App.2009). Arizona Administrative Code ("A.A.C.") R15–2D–503 provides:

> Gain or loss from the sale, exchange, or other disposition of tangible or intangible personal property or real property constitutes business income if the property while owned by the taxpayer was used in the

taxpayer's trade or business. However, if the property was used for the production of nonbusiness income ... before its sale, exchange, or other disposition, the gain or loss constitutes nonbusiness income.

*Id.* As Taxpayer recognizes, this provision establishes a functional test. The regulation comports with our conclusion that the statutory definition of business income includes income from the sale or disposition of property assets that were previously used by the taxpayer for the production of business income. *See Ross–Araco Corp. v. Com., Bd. of Finance and Revenue,* 544 Pa. 74, 674 A.2d 691, 693 (1996). We also recognize that R15–2D–503 is nearly identical to its predecessor regulation, A.A.C. R15–2–1131(B)(1)(b), which was adopted in 1986. We note the Arizona Legislature has not changed the business income definition in spite of a long-standing administrative regulation adopting the functional test. *See Davis v. Ariz. Dep't of Revenue,* 197 Ariz. 527, 530, ¶ 15, 4 P.3d 1070, 1073 (App.2000) (noting the legislature had several years to respond to a Department regulation if it disagreed).

¶ 22 Moreover, this interpretation also better reflects the realities of taxing a property asset over time. One treatise explains that if a taxpayer has used an asset in its trade or business, "there is no reason as a matter of principle why income generated by the disposition of that asset should be treated any differently from the income the asset generated while used in the taxpayer's trade or business." *Hellerstein* ¶ 9.05[2][c], at S9–34; *accord* A.A.C. R15–2D–503 ex. 2 ("The taxpayer constructed a plant for use in its multistate manufacturing business and 20 years later sold the property at a gain while it was in operation by the taxpayer. The gain is business income."). To the extent that gain on a disposition represents expenses deducted from apportionable income when the business was using the property,

> it lends additional support to adoption of the functional test. It would be incongruous (and, from the state's standpoint, inequitable) for a taxpayer to be able to reduce in-state apportionable income through depreciation or other deductions while the asset was being used in the trade or busi-

ness and then, when the asset is sold, to avoid "recapture" of that income in the state by treating the income ... as non-business income....

*Hellerstein* ¶ 9.05[2][c], at S9–34.[2]

¶ 23 Taxpayer urges that in cases of doubt, we must construe any ambiguity in favor of the taxpayer. But we would consider application of that maxim only "after considering the interpretive guidance provided by the legislature, and applying standard rules of construction." *Ariz. Dep't of Revenue v. Salt River Project Agric. Improvement & Power Dist.*, 212 Ariz. 35, 41, ¶ 22, 126 P.3d 1063, 1069 (App.2006); *see also Centric–Jones Co. v. Town of Marana*, 188 Ariz. 464, 469, 937 P.2d 654, 659 (App.1996) (criticizing the taxpayer's approach for side-stepping the statutory construction process and applying the maxim prematurely). Our interpretation of A.R.S. § 43–1131(1) is based on the statutory language and standard rules of construction.[3]

¶ 24 For these reasons, we hold that the definition of "business income" in A.R.S. § 43–1131(1) is set forth in two clauses, and Arizona may tax corporate income as "business income" if the income satisfies either definitional clause.

## II. There Is No "Liquidation Exception" to the Definition of Business Income in A.R.S. § 43–1131(1)

¶ 25 Alternatively, Taxpayer contends that final dispositions through liquidation or otherwise do not qualify as business income under either the transactional or functional test. According to Taxpayer, going out of business simply does not occur in the regular course of business.

¶ 26 We conclude that such a "liquidation exception" is inconsistent with our interpretation of the business income definition and, particularly, the reach of the functional test. The functional test requires us to look beyond the regularity of a transaction and to consider whether the use or disposition of the property forms an integral part of the taxpayer's business. "If the property had an integral function ... its income properly can be apportioned and taxed as business income, even though the transaction itself does not reflect the taxpayer's normal trade or business." *Pierce Assocs.*, 462 A.2d at 1131. As the California Court of Appeal explained in *Jim Beam*, a liquidation exception cannot be reconciled with the functional test. 133 Cal.App.4th 514, 34 Cal.Rptr.3d at 883. The inconsistency arises because the proposed exception "focuses on the nature of the transaction, rather than on the relationship between the property sold and the taxpayer's regular trade or business operations." *Id.*

¶ 27 Taxpayer relies on decisions that articulate a different interpretation of business income. *See McVean & Barlow, Inc. v. New Mexico Bureau of Revenue*, 88 N.M. 521, 543 P.2d 489 (App.1975) (superseded by N.M. Stat. Ann. § 7–4–2). In *McVean*, the

---

**2.** Taxpayer argues that the *Hellerstein* treatise ultimately supports the single transaction test construction. See *Hellerstein* ¶ 9.05[2][c], at S9–35. We cite *Hellerstein* regarding pertinent, discrete issues and not for any overall conclusion. We also note that *Hellerstein* acknowledges: "The [UDITPA] drafter's comments ... do provide a source of guidance in interpreting a statute that may be regarded as ambiguous with respect to the functional test." *Id.* at S9–34–S9–35.

**3.** Taxpayer also contends that constitutional principles prevent apportionment of its income. Both the Due Process and Commerce Clauses of the United States Constitution require "some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax" and prohibit a state from taxing gains outside its borders. *Allied–Signal, Inc. v.*

*Dir., Div. of Taxation*, 504 U.S. 768, 777, 112 S.Ct. 2251, 119 L.Ed.2d 533 (1992) (citing *Miller Bros. Co. v. Maryland*, 347 U.S. 340, 344–45, 74 S.Ct. 535, 98 L.Ed. 744 (1954)). When "there is no dispute that the taxpayer has done some business in the taxing State, the inquiry shifts from whether the State may tax to what it may tax." *MeadWestvaco Corp. ex rel. Mead Corp. v. Ill. Dep't of Revenue*, 553 U.S. 16, 25, 128 S.Ct. 1498, 170 L.Ed.2d 404 (2008).

According to Taxpayer, the Department consequently cannot tax the sale of certain minority stock interests because "those unrelated corporations were not part of any unitary business with activities in Arizona." On appeal, Taxpayer fails to adequately develop why the unitary requirements were not met in this case. Therefore, even assuming that the unitary business issue is relevant, we have no basis on which to evaluate Taxpayer's argument.

court held that the liquidation of one pipeline section of the business was a very unusual business transaction that "changed the basic nature of [the] business." *Id.* at 492. Therefore, the sale did not constitute an integral part of the taxpayer's regular trade or business operations. *Id.* We reject the *McVean* court's reliance upon the "unusual" nature of the transaction as a basis to classify the gains as non-business income. Moreover, *McVean* is distinguishable because it applied the transactional test without considering the functional test.

¶ 28 Furthermore, we deem irrelevant the question of how the proceeds of liquidation are used under the functional test. "The key inquiry under the functional test should be the relationship of the assets acquired, managed, or disposed of to the taxpayer's *existing* business at the time the income was realized, not to some future business operations that may be funded by the proceeds from the property." *Hellerstein* ¶ 9.05[2][b], at S9–30 (emphasis in original) (criticizing *Lenox, Inc. v. Tolson,* 353 N.C. 659, 548 S.E.2d 513 (2001)).

¶ 29 Finally, Taxpayer's interpretation would result in a lack of symmetry. Assets would be depreciated and expenses deducted, reducing business income prior to disposition of the assets, but upon sale any gain would become nonbusiness income under a liquidation exception. Consequently, a single state might capture all the income while the states that had previously allowed expenses on an apportioned basis would shoulder the deductions. Such an approach finds no support in *Jim Beam* or the Arizona regulations.

## III. The Tax Court Properly Applied A.R.S. § 43–1131(1) To Taxpayer's Gains

¶ 30 We now apply these principles to gains Taxpayer received on its assets. Most of these assets consist of underperforming or otherwise undesired product lines. We consider: (1) transactions by Harris, the parent company, (2) the sale of Lanier's medical transcription product line, (3) and transactions by Harris's consolidated subsidiaries.

### A. Harris's Transactions

¶ 31 Taxpayer argues that Harris's sale of business lines were "unique transactions" and did not give rise to business income within the meaning of the transaction test. *See Ex Parte Alabama Dep't of Revenue,* 69 So.3d 144, 151–52, 153 (Ala.2010) (holding that proceeds from "non-core" businesses sold in an effort to divest entities outside of the taxpayer's consumer product business did not satisfy the transaction test and constituted nonbusiness income). Further, Taxpayer contends that the functional test is not satisfied because ceasing business operations is not furthering business operations. *See, e.g., Lenox,* 548 S.E.2d at 518.

¶ 32 The Department concedes that Harris's subsidiaries engaged in "multiple unrelated businesses" but contends that gains on property dispositions qualify as business income so long as Harris had an identified interest and reported gains from those assets as business income during the time it held them. The record reflects that Taxpayer previously reported the gains on the "photomask" [4] and paging product lines as business income. Harris also reported a gain on the controls product line when contributing it to a joint venture with GE.

¶ 33 Under A.A.C. R15–2D–503, all gain realized on these assets is business income if Taxpayer had used the assets to produce income in its regular trade or business. Harris owned the controls product line, as part of a joint venture with GE, that provided equipment designed to help electric utilities distribute, control, monitor, analyze and forecast energy resources. The asset contributed to Harris's joint venture, and was part of its trade or business prior to sale, and upon its sale, constituted business income. *See id.; accord Texaco–Cities,* 230 Ill.Dec. 991, 695 N.E.2d at 484–87. Further, Taxpayer's acquisition, control, and use of the property "contribute[d] materially to the taxpay-

---

4. A "photomask" is an opaque plate with holes or transparencies through which light shines in a defined pattern. It is used in lithography, which is one of the methods used to manufacture semiconductors.

er's production of business income." *Hoechst,* 106 Cal.Rptr.2d 548, 22 P.3d at 338.

¶ 34 The argument for business income classification applies equally to the photomask line and the paging lines through which Taxpayer sold intercoms and other equipment. While held by Harris during the relevant tax years, these businesses produced business income. *See id.* Because no liquidation exception applies, the tax court properly concluded that the proceeds from these lines are business income under the functional test.

¶ 35 In addition, we conclude that Taxpayer's activities satisfy the transaction test. *PPG Industries, Inc. v. Dep't of Revenue* illustrates the point. 328 Ill.App.3d 16, 262 Ill.Dec. 208, 765 N.E.2d 34 (2002). PPG excluded gain on the sale of a Michigan-based oil and gas subsidary on its Illinois corporate income tax return as nonbusiness income. *Id.* at 44–45. The Illinois Court of Appeals, however, noted that PPG's annual report reflected that it had acquired several businesses during the relevant year and its objectives included selling businesses. *Id.* at 45. Because PPG had bought and sold businesses in the regular course of business, and in furtherance of business, the gains from these transactions constituted business income. *Id.*

¶ 36 The record documents Harris's pursuit of similar objectives. Harris's 1999 and 2000 annual reports indicate that the company regularly acquired and disposed of product lines. In the 1999 report, Harris announces the "repositioning of the company" to consolidate resources on communications equipment for which it had "solid market positions and industry-leading products." To that end, Harris sold its power semiconductor product line, spun off Lanier Worldwide as a shareholder dividend, and sold its switch and alarm management business. The 2000 report similarly documents Harris's expansion of its broadcast product line through acquisition of Wavtrace, Inc., TRT Lucent Technologies' microwave product line, Louth Automation, and Pacific Research and Engineering Corporation. In light of this record,

the sale of the photomask and paging lines furthered Harris's business and occurred in its regular course of buying and selling, thereby qualifying as business income. *See id.; Atl. Richfield Co. v. State,* 198 Colo. 413, 601 P.2d 628, 632 (1979) (holding that gain from the sale of assets qualifies as business income when the taxpayer was engaged in the acquisition and divestiture of other assets or companies in the regular course of its business).[5]

¶ 37 Harris also attempted to claim two forms of interest income as nonbusiness income: income from a short-term cash investment and interest earned on gains from spinning off Lanier. During litigation, Taxpayer conceded that the first category met the functional test described in example 5 of A.A.C. R15–2D–504. Because Taxpayer comingled the interest funds with cash receipts and disbursements from ongoing operations, we likewise affirm the characterization of that amount as business income.

### B. Sale Of Medical Transcription Product Line

¶ 38 Taxpayer also challenges the Department's refusal to recognize non-business income from Taxpayer's disposition of its Lanier business unit. This unit consisted of several businesses engaged in supplying office equipment and office-related services. Taxpayer spun off 90 percent of the Lanier operations as common stock, after gaining $22 million from selling Lanier's medical transcription product line. Later, Taxpayer sold its remaining 10 percent share at a loss.

¶ 39 Taxpayer's characterization of the spin-off gains as nonbusiness income is inconsistent with its earlier income characterizations. Prior to the spin-off, Taxpayer reported income from the Lanier business unit as business income on the Arizona consolidated returns for the tax years at issue. When it sold the last 10 percent at a loss, Taxpayer treated that loss as a component of business income on its Arizona consolidated return.

¶ 40 Under A.A.C. R15–2D–503, the gain constitutes business income because Taxpay-

---

**5.** Taxpayer waived the issue of foreign currency gains by failing to assert it in the Opening Brief.

*See Nelson v. Rice,* 198 Ariz. 563, 567 n. 3, ¶ 11, 12 P.3d 238, 242 n. 3 (App.2003).

er used Lanier in its trade or business during the time it held that asset. *See Texaco–Cities*, 230 Ill.Dec. 991, 695 N.E.2d at 484. Also, the transaction itself was of the type in which Taxpayer regularly engaged, as an annual report reflects the strategy to spin off Lanier in an effort to increase shareholder value and as part of its repositioning effort. *See PPG*, 262 Ill.Dec. 208, 765 N.E.2d at 45.

## C. Transactions By The Consolidated Subsidiaries

¶ 41 Finally, Taxpayer contests the characterization as business income of gains reported by its consolidated subsidiaries. The consolidated subsidiaries at issue are: Advanced Fibre Communications, Inc. ("AFC"), Cadence, Spectrian Corporation, Synopsys, Inc., Intersil, AirNet Communications, GE Harris Railway Electronics, and a partnership. Taxpayer reported various gains derived from the sales of the Logic product line, an antenna business, and royalty and interest income.

¶ 42 Taxpayer analyzes the transactions as though they were not performed by the parent, Harris, in the regular course of its telecommunications equipment business. This approach defeats the intent of the consolidated election. We perceive no basis for including a subsidiary in a consolidated return and then excluding all subsidiary income as nonbusiness because the subsidiary's business is unrelated to the parent's business.

¶ 43 Under A.R.S. § 43–947(F), an affiliated group filing a consolidated return "is considered to be and shall be treated as a single taxpayer" for allocation and apportionment purposes. This consolidation rule applies "regardless of whether each member is subject to tax under this title." A.R.S. § 43–947(A). The Arizona gross income is the consolidated federal taxable income of the group, which may qualify as either business or nonbusiness income under A.R.S. § 43–1131(1) and (4).

¶ 44 According to Arizona Corporate Tax Ruling ("CTR") 94–12: "There may be multiple unrelated trades or businesses within the Arizona affiliated group." In evaluating whether income qualifies as business or nonbusiness income under A.R.S. § 43–1131,

"one may look to a single corporation, a part of a corporation, or a group of corporations sufficiently integrated to constitute a business." *Id.* The subsidiaries here engaged in separate businesses. For example, Manatee, TAP, VFC, Harris Southwest, and Harris Investments held and managed certain assets, minority interests in stock, a joint venture, and other businesses. Another entity held patents acquired as part of Harris's purchase of the GE semiconductor business.

¶ 45 In light of these facts, the tax court could appropriately examine the transactions on a business-by-business basis. Manatee, TAP, VFC, Harris Southwest, and Harris Investments each sold assets as part of its operations. Holding and selling assets thus was an integral part of the trade or business of each subsidiary. As a result, income from selling these assets will be business income.

¶ 46 Example 1 from CTR 94–12 illustrates the point. Corporations A, B, C, D, and E file a consolidated federal return as an Arizona affiliated group. Corporations A, B, and C respectively manufacture, market, and finance mobile homes, but engage in no real estate transactions. Corporation D operates a chain of pet food stores, while Corporation E invests in and markets commercial real estate. Corporation E sells a shopping center. The income from the sale is in the course of Corporation E's regular trade or business, and thus the sale proceeds are business income. *Id.*

¶ 47 Likewise, viewing each corporation separately, we conclude that holding and selling assets constitutes a fundamental part of the trade or business of Manatee, TAP, VFC, Harris Southwest, and Harris Investments. *See id.* Income from the sales was also earned in the regular course of their respective businesses and is therefore business income. *See id.* Moreover, the assets were used in the subsidiaries' business to the extent that their business was to hold them. *See* A.A.C. R15–2D–503.

¶ 48 Turning to the royalty income, we conclude it also qualifies as business income when the purpose of acquiring and holding the patent rights is related to the

trade or business operation. *See* A.A.C. R15–2D–506. Harris Semiconductor held patents on memory chips, obtained in the GE semiconductor purchase. Taxpayer ultimately was able to license the patents and receive royalties from companies that previously had infringed. Because Harris Semiconductor's business was to hold patents or trademarks, any income derived from them is business income. *See* A.A.C. R15–2D–506 ex. 2 (royalties received on acquired copyrights are business income); *see also Dover Corp. v. Dep't of Revenue*, 271 Ill.App.3d 700, 208 Ill.Dec. 167, 648 N.E.2d 1089, 1097 (1995) (explaining that royalty income does not become nonbusiness income "merely because Dover enforced its right to receive such income through litigation.").

¶ 49 Taxpayer counters that A.R.S. § 42–2078(B) precludes the Department from applying a new interpretation of this rule. Invoking a hearing officer's statement in a prior audit, Taxpayer asserts that the Department took the official position that sales of minority stock interests in Cadence and Synopsys gave rise to nonbusiness income.

The difference is that the sales covered in the previous audit occurred within Harris, which owned the stock directly. The Department does not challenge such sales here. We perceive no inconsistency or change in interpretation.

## CONCLUSION

¶ 50 We affirm the tax court's grant of summary judgment to the Department. In addition, we deny Taxpayer's request for attorneys' fees under A.R.S. § 12–348(B)(1).

Presiding Judge JOHN C. GEMMILL delivered the opinion of the Court, in which Judge MARGARET H. DOWNIE and Judge PETER B. SWANN joined.